# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**MICHAEL CHEERVA**
Emsviller Williams Noland & Clarke, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**SCOTT P. WYATT**
**KEVIN G. KLAUSING**
Campbell Kyle Proffitt, LLP
Carmel, Indiana

FILED

Jun 12 2014, 10:22 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| LESLIE FARLEY PITCAVAGE, | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No. 29A02-1307-DR-597 |
| | ) | |
| JOEL MICHAEL PITCAVAGE, | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE HAMILTON SUPERIOR COURT
The Honorable Daniel J. Pfleging, Judge
Cause No. 29D02-1002-DR-463

June 12, 2014

**OPINION – FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Petitioner, Leslie F. Pitcavage (Leslie), appeals the trial court's Findings of Fact, Conclusions of Law and Decree of Dissolution of Marriage (Decree), issued pursuant to the dissolution of her marriage to Appellee-Respondent, Joel M. Pitcavage (Joel).

We affirm in part, reverse in part, and remand.

## ISSUES

Leslie raises two issues on appeal, which we restate as the following four issues:

(1) Whether the trial court abused its discretion by awarding custody of the parties' minor child to Joel;

(2) Whether the trial court erred by ordering Leslie to undergo psychotherapy;

(3) Whether the trial court erred in its valuation of certain marital assets; and

(4) Whether the trial court erred in calculating and dividing the marital estate.

Joel raises one additional issue on cross-appeal, which we restate as: Whether the trial court abused its discretion in its valuation of Leslie's 401(k) account.

## FACTS AND PROCEDURAL HISTORY

Joel and Leslie met in Louisiana in 2004 and were married on July 29, 2006. Five months later, they relocated to Fishers, Indiana. Leslie is employed as a personal banker and investment advisor, and Joel has a job in sales and marketing. Joel and Leslie have one child, S.P. (the Child), born on March 19, 2008. Leslie also has two children from a prior relationship, A.F. and N.F.

2

Wedded bliss was short-lived as conflicting parenting styles and financial strain contributed to the deterioration of the marriage. One year into their marriage, while Leslie was pregnant with the Child, Joel initiated divorce proceedings. The couple sought counseling and Joel did not pursue the divorce. Leslie quit her job in order to be a stay-at-home-mom, and in January of 2009, in the midst of the economic downturn, Joel was laid off from his job. He struggled to find and maintain employment thereafter. When Leslie returned to the workforce in May of 2009, Joel became the Child's primary caretaker, although he continued to work part-time and temporary jobs in an effort to stave off foreclosure of their home.

In addition to the effect of financial stressors on the marriage, the hostility between Leslie and her sixteen-year-old daughter, A.F., and between Joel and A.F., created an increasingly volatile home environment. A.F., who had been subjected to repeated incidents of sexual abuse throughout her childhood and adolescence, experienced severe emotional and behavioral difficulties. Joel disagreed with Leslie's passivity to A.F.'s acts of defiance, violent outbursts, and run-ins with law enforcement; he feared that A.F. would have a negative influence on the Child. In addition, Leslie and A.F.'s arguments often escalated to screaming matches and even physical altercations.

A.F.'s habitual stealing prompted Joel and Leslie to install a lock on their bedroom door. Joel routinely locked the door to keep A.F. out of the room while he bathed the Child and when the Child napped. In December of 2009, annoyed by the fact that she was unable to freely access her mother's bedroom, A.F. reported to Leslie that Joel was locking the door because he was acting inappropriately with the Child. In turn, Leslie, who is a victim

of rape and domestic violence, confronted Joel about sexually abusing the Child. Angered by the accusation, Joel threatened divorce, contacted the Child's pediatrician, and discussed the issue with their marriage counselor, Jerrilyn Herd (Herd).

Joel desperately sought suitable employment in the Fishers area, but his efforts were unsuccessful. In February of 2010, he interviewed for a job with his current employer in St. Louis, Missouri. Joel discussed the logistics of this employment opportunity with Leslie, who declined Joel's request to accompany him to St. Louis. Joel suggested that, if hired, he could save the family money on rent and daycare by taking the Child with him to reside with his sister, Judith (Judith), who lives just thirty miles from St. Louis with her husband, Bill (Bill), and their two teenage sons. Concerned that Joel would relocate with the Child, Leslie filed a petition to dissolve the marriage on February 26, 2010. On March 4, 2010, Joel accepted the St. Louis job and, shortly thereafter, moved into Judith's house in Waterloo, Illinois.

A battle for custody of the Child ensued. In May of 2010, five months after her initial allegation, Leslie reported to authorities that Joel had sexually abused the Child. The Fishers Police Department investigated. Given the assessment of the Child's pediatrician that there was no indication of sexual mistreatment, along with the fact that Leslie only reported the alleged abuse in the wake of the custody dispute, the authorities dismissed the complaint as being unfounded.

Per Joel's request, on July 9, 2010, the trial court appointed a clinical psychologist, Dr. Bart Ferraro (Dr. Ferraro), to perform a custody evaluation. Following a hearing on August 13, 2010, the trial court issued a Preliminary Order in which it awarded custody of

4

the Child to Leslie during the pendency of the dissolution proceedings. The trial court ordered Joel to pay Leslie $166 per week in child support, as well as $320 per month for the expenses of the marital residence. Joel filed for bankruptcy in early 2011, and his debts were discharged in April of 2011.

On May 15, 2011, Dr. Ferraro submitted his report to the court, recommending that Joel be awarded primary physical and sole legal custody. Leslie subsequently retained Dr. Richard Lawlor (Dr. Lawlor) to perform a second custody evaluation. Dr. Lawlor recommended that the parties should share joint legal custody with Leslie having primary physical custody. Joel hired a third clinical psychologist, Dr. Stephen Ross (Dr. Ross), to critique the opinions of both Dr. Ferraro and Dr. Lawlor. Dr. Ross found scoring errors in Dr. Lawlor's psychological examination of Joel and testified that Dr. Ferraro's evaluation was more comprehensive.

On August 28, 29, and 31, 2012, the trial court conducted the final dissolution hearing and entered its Decree on January 28, 2013. The trial court concluded that it was in the Child's best interests to award legal and physical custody to Joel. Leslie received parenting time and was instructed to pay child support. Also, pursuant to Dr. Ferraro's recommendation, the trial court ordered Leslie to participate in "intensive individual psychodynamically-oriented psychotherapy." (Appellant's App. p. 28). After calculating the net marital estate, the trial court determined that Joel and Leslie should each receive an equal share. On February 26, 2013, Leslie filed a motion to correct error. The trial court held a hearing on May 9, 2013 and denied Leslie's motion on June 12, 2013.

Leslie now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

Pursuant to Indiana Trial Rule 52, when a trial court issues specific findings of fact and conclusions of law, we apply a two-tiered standard of review: we must determine "whether the evidence supports the findings and whether the findings support the judgment." *Tompa v. Tompa*, 867 N.E.2d 158, 163 (Ind. Ct. App. 2007). We do not reweigh the evidence or assess the credibility of witnesses, and we consider only the evidence most favorable to the trial court's judgment. *Id.* We will not set aside the trial court's findings or conclusions unless they are clearly erroneous—that is, if they are unsupported by the facts and inferences contained in the record. *Id.* We will find the judgment to be clearly erroneous if, after reviewing the record, we are left with a firm conviction that there has been a mistake. *Id.* Conclusions of law are reviewed *de novo*. *Id.* Where, as here, the trial court enters findings of fact and conclusions of law *sua sponte*, its "findings control only as to the issues they cover and a general judgment will control as to the issues upon which there are no findings." *Pitman v. Pitman*, 721 N.E.2d 260, 264 (Ind. Ct. App. 1999), *trans. denied*. A general judgment will be affirmed if it is sustainable upon "any legal theory supported by the evidence." *Id.*

### II. *Custody*

First, Leslie claims that the trial court abused its discretion by awarding custody of the Child to Joel. The trial court is vested with the sound discretion to make custody determinations, and we will uphold the trial court's judgment absent an abuse of discretion. *Gonzalez v. Gonzalez*, 893 N.E.2d 333, 335 (Ind. Ct. App. 2008). Because the trial court

6

is able to observe the parties' conduct and demeanor and hear their testimony, we accord its decision considerable deference. *Kondamuri v. Kondamuri*, 852 N.E.2d 939, 945-46 (Ind. Ct. App. 2006). We will not reweigh the evidence, assess the credibility of witnesses, or substitute our judgment for that of the trial court. *Id.* at 946. We will affirm the trial court's custody order unless "it is clearly against the logic and effect of the facts and circumstances or the reasonable inferences drawn therefrom." *Id.*

A. *Sufficiency of Trial Court's Findings*

Leslie contends that the trial court's findings of fact are insufficient to support its custody determination. Specifically, Leslie submits that the trial court simply "regurgitat[ed] the reports and testimony of [Dr. Ferraro, Dr. Lawlor, and Dr. Ross]." (Appellant's Br. p. 10). Joel, however, contends that Leslie's "hyper-technical assertion . . . mischaracterizes the trial court's order and ignores the spirit and purpose of [Trial Rule] 52." (Appellee's Br. p. 12).

"Findings of fact are a mechanism by which a trial court completes its function of weighing the evidence and judging witnesses' credibility." *Garriott v. Peters*, 878 N.E.2d 431, 438 (Ind. Ct. App. 2007), *trans. denied*. A satisfactory finding of fact "is a simple, straightforward statement of what happened." *Perez v. U.S. Steel Corp.*, 426 N.E.2d 29, 33 (Ind. 1981). "A court or an administrative agency does not find something to be a fact by merely reciting that a witness testified to X, Y, or Z. Rather, the trier of fact must find that what the witness testified to is the fact." *In re Adoption of T.J.F.*, 798 N.E.2d 867, 874 (Ind. Ct. App. 2003) (citation omitted). As such, where a trial court's findings are merely recitations of a witness' testimony, they cannot be construed as "true factual

7

determinations." *Garriott*, 878 N.E.2d at 438. We treat the trial court's inclusion of these findings as "mere surplusage" rather than harmful error. *Perez*, 426 N.E.2d at 33. However, where the trial court has adopted the witness' testimony, such a "'finding' may be considered a finding of fact." *In re Adoption of T.J.F.*, 798 N.E.2d at 874.

In the present case, the trial court's Decree consists of 129 combined findings of fact and conclusions thereon. Leslie disputes the validity of the following eighteen findings:

38.  Dr. Ferraro made several findings concerning [Leslie]. Some of these findings are as follows:
   a.  [Leslie] acknowledged disparaging [Joel] and making accusations against him in the children's presence.
   b.  [Leslie] delayed in reporting alleged sexual abuse of [the Child] by [Joel] for approximately six months. She only reported it after issues arose concerning [the Child's] custody.
   c.  [Leslie] continues to mistrust [Joel]. She still harbors feelings that [Joel] sexually abused [the Child] despite the allegations being invested by [the Child's pediatrician] and the authorities. These allegations were dismissed with no action.
   d.  [Leslie's] potential is high for jeopardizing [Joel's] long-term involvement with, and co-parenting of [the Child].
   e.  [Leslie] acknowledged that she has engaged in screaming with [A.F.] and has had physical altercations with her.
   f.  [Leslie] called the police on [A.F.] on at least two occasions.
   g.  [Leslie] has a long history of being the victim of domestic violence. She was first exposed to domestic violence by her parents. She was disciplined by her father by means of a hand or belt, at times excessively and angrily, leaving bruises on her legs.
   h.  [Leslie] was raped at age fifteen leading to pregnancy and abortion. These facts were omitted from her autobiography that she submitted to Dr. Ferraro. [Leslie] told Dr. Ferraro, that in retrospect, she wishes that she had counseling at that time in her life.
   i.  In college, [Leslie] was raped, choked and beaten by another man. This was also absent from her autobiography that she

8

submitted to Dr. Ferraro. She did not report this incident to the police.

j. Absent from her autobiography was any mention of her first marriage. [Leslie] characterized her first husband as a controlling, alcoholic and abusive man. Nevertheless, [Leslie] continues to let [N.F.] and [A.F.] see him.

k. For an extended period [A.F.] and her cousins were raped by [Leslie's] brother. [Leslie] decided not to pursue charges against her brother. It does not appear that [A.F.] has received any counseling and/or therapy for this traumatic incident.

l. [A.F.] was raped in Mexico in the summer of 2007. She was thirteen (13) years old. [Leslie] did not pursue counseling and therapy for [A.F.] after this traumatic incident. [Leslie] did not pursue charges against the perpetrator. [Leslie] placed the blame for the incident on [Joel].

m. Dr. Ferraro is concerned about the impact of [Leslie's] sexual assault history on the decisions being made for [A.F.], and potentially [the Child].

n. [Leslie] has an inability to follow-through with discipline for the children.

o. [Leslie] has shown an unwillingness to communicate with [Joel] regarding child issues.

p. [Leslie] sent [Joel] a text message fabricating a story about [the Child] being in the [e]mergency [r]oom. She stated this was in an effort to "test" [Joel].

q. Dr. Ferraro listened to a recorded conversation and noted the contempt displayed by [Leslie] towards [Joel].

r. Around Christmas, [Joel] sent [N.F.] cash and a note. [Leslie] gave [N.F.] the cash, but withheld the note.

39. Dr. Ferraro made the following findings concerning [Leslie's] psychological testing:

a. [Leslie] has the intellectual capacity and academic achievement necessary to foster [the Child's] development. [Leslie] has a lack of insight regarding the impact of her behavior on others. [Leslie's] emotions may manifest in an unpredictable fashion.

b. [Leslie] has low self-esteem, insecurities and inadequacies. Dr. Ferraro best characterized her as emotionally fragile.

c. The data suggests that [Leslie] is immature. Superficially, she is charming, but she can be subtly controlling and manipulative in her relationships.

d. A question is raised as to [Leslie's] capacity to attune to others or provide nurturance, particularly when their needs or feelings

9

are discrepant from her own. The data suggest that unless addressed therapeutically, these traits may continue to hamper both her life as well as those who are in her care.

40. Dr. Ferraro reviewed the W-2G from 2009 that [Leslie] gave him and asked follow-up questions to [Joel]. Dr. Ferraro concluded that this was a one-time gambling event when [Joel] stopped at the casino to use the restroom and that there was no evidence of a pervasive gambling problem.

41. Dr. Ferraro made the following findings concerning [Joel's] psychological testing:

   a. [Joel] has the intellectual capacity and academic achievement necessary to foster the cognitive development of [the Child].

   b. Projective data suggests that [Joel] is unlikely to act out of emotion.

42. Dr. Ferraro made several findings as a result of the interviews he had with collateral contacts. Some of these findings are as follows:

   a. [Herd], LCSW, indicated to Dr. Ferraro that [Leslie] had a repeated tendency to override [Joel's] point of view.

   b. [Herd] indicated that [Leslie's] parenting style was lacking, permissive and ineffective, and when this style led to crisis and conflict, [Leslie] predictably responded in a panicky and reactive fashion.

   c. JoAnne Bates [(Bates)], LMFT, who provided some counseling for [A.F.] and [Leslie], indicated to Dr. Ferraro that [Leslie's] parenting was too permissive and undermining to [Joel's] more appropriate efforts.

   d. [Bates] told Dr. Ferraro that [Leslie] was inappropriately enmeshed with [A.F.] and, in this regard, was unable to set and maintain appropriate limits, adding, "But she did know how to call the police." [Bates] went on to indicate that [Leslie] demonstrated a toxic level of enmeshment with [A.F.], a reversal of the parent-child roles, a lack of follow-through and a rather notable lack of any natural or intuitive understanding for appropriate boundaries.

43. After considering the clinical interviews, the parent-child observations, evaluating the psychological testing results, interviewing the collateral contacts and considering the collateral documents, Dr. Ferraro made several conclusions, some of which are as follows:

   a. [Joel's] concerns about [Leslie's] potential to expose or fail to protect [the Child] from emotional or other abuses appear to have merit and warrant such concern.

10

b.      [Joel's] concerns that [Leslie] would interfere with his parenting time were corroborated.

c.      [Leslie's] development is marred by the physical abuse she incurred at the hands of her father and by her being witness to ongoing episodes of marital conflict and discord. [Leslie's] experiences of being a victim of multiple rapes and domestic violence without seeking treatment have inhibited her development.

d.      Dr. Ferraro expressed concern for [Leslie's] appreciation of the risks posed, not only to her but to the children in her care, in the context of their dysfunctional and episodically violent union.

e.      Dr. Ferraro rejects [Leslie's] belief that by sharing the same gender as [the Child], her needs will be more adequately met by [Leslie].

f.      Dr. Ferraro determined that the issue of splitting siblings will not be problematic because both [N.F.] and [A.F.] have a subjective bias against [Joel] due to [Leslie's] influence and their views are likely to affect [the Child] as she grows older. Dr. Ferraro notes that the children, including [the Child], have experienced a "war zone" under [Leslie's] roof. The evaluation also finds that proximity to siblings in this case may pose a greater source of stress or risk on [the Child's] development.

g.      Dr. Ferraro has concern that [Leslie's] capacity to serve as the primary caregiver will be affected by her longstanding pattern of emotional dysfunction and trauma, which has gone virtually untreated, and the significant risk this poses on her capacity for a healthier personal or parental relationship.

h.      Low self-esteem, combined with unresolved feelings of anger or resentment, are anticipated to at times produce a dismissive or retaliatory relational style and fuel a chronic level of disorder and dysfunction in [Leslie's] interpersonal life.

44.     On or about May 15, 2011, Dr. Ferraro completed the Custody Evaluation. Dr. Ferraro made several recommendations:

a.      Legal custody should be awarded solely, rather than on a joint or shared basis, and that it be rendered in favor of whichever parent is granted primary or [s]ole [p]hysical [c]ustody of [the Child].

b.      [Joel] should be awarded [s]ole [p]hysical [c]ustody of [the Child].

c.      [Leslie] should be ordered to become involved in her own intensive individual psychodynamically-oriented

11

psychotherapy on at least a weekly basis with one of the professionals specifically set forth in the custody evaluation. The therapist providing this service should have access to Dr. Ferraro's custody evaluation. If recommended by her therapist, [Leslie] should undergo psychiatric evaluation (to be performed by one of the professionals set forth in the custody evaluation) and ordered to comply with any recommendations.

d. [Leslie] should be assigned a parenting coach from the list set forth in the custody evaluation.

e. The parties should utilize a parenting coordinator from the list set forth in the custody evaluation.

45. Dr. Ferraro determined that [Joel] will provide a more stable home and lifestyle for [the Child] and is more likely to keep [Leslie] involved and informed than if the roles were reversed.

46. Dr. Ferraro does not believe that the elapsing of time from the date of his report until the date of final hearing would alter his recommendations. He indicated that the best predictor of future behavior is past behavior and that there is no potential for the history to ever change. Specific to this case, Dr. Ferraro was confident in his evaluation's reliability because there was no evidence that [Leslie] complied with his recommended counseling.

47. Dr. Ferraro performed a relocation risk analysis, considering nine separate factors. He concluded that [the Child's] relocation to Waterloo with [Joel] was in her best interests.

* * *

68. Dr. Ross testified that both Dr. Ferraro and Dr. Lawlor have good reputations within their field. Nevertheless, it was apparent that Dr. Lawlor made scoring errors on [Joel's] and [Leslie's] MMPI-2.

69. Dr. Ross noted that Dr. Lawlor hand-profiles the MMPI-2 tests and that such scoring makes the profile prone to errors.

70. Dr. Ross re-scored the MMPI-2 tests for everyone and discovered that Dr. Lawlor significantly mis-scored [Joel's] MMPI-2 test. Dr. Ross re-scored [Joel's] MMPI-2 twice to confirm Dr. Lawlor's scoring error. Dr. Ross discovered that Dr. Lawlor mis-scored [Leslie's] MMPI-2 by a few points, which he deemed insignificant.

71. Dr. Ross testified that [Joel's] MMPI-2 results, when correctly scored, do not result in a profile that has a "psychotic valley."

72. Despite Dr. Lawlor's testimony that [Joel's] "psychotic valley" profile was not valid, Dr. Ross testified that based on Dr. Lawlor's profiling and recommendations, this finding was not discounted.

73. Dr. Ross testified that he believes it is the best practice for custody evaluators to perform a battery of tests, not[] merely an MMPI-2.

12

When performing custody evaluations, Dr. Ross conducts a battery of tests.

74. Dr. Ross stated that the national trend is showing an increase in the number of tests utilized in custody evaluations.

75. Dr. Ross testified that Dr. Ferraro's evaluation was more thorough and organized than Dr. Lawlor's.

(Appellant's App. pp. 17-23, 26-27 (citations omitted)).

Leslie correctly asserts that several of the trial court's findings recite the testimony and opinions of the three psychologists.[1] Ordinarily, we would disregard the findings preceded by "testified that" and confine our review solely to any remaining valid findings. *See Parks v. Del. Cnty. Dep't of Child Servs.*, 862 N.E.2d 1275, 1279 (Ind. Ct. App. 2007). However, in this case, we do not find that it would serve the purpose of Indiana Trial Rule 52 to discard the trial court's findings. We are persuaded by Joel's argument that the trial court's factual findings "provide the parties and any subsequent reviewing court with a comprehensive theory upon which the case was decided." (Appellee's Br. p. 13). *See Sandoval v. Hamersly*, 419 N.E.2d 813, 816 (Ind. Ct. App. 1981). Parties "have a legal right to know the evidentiary bases upon which the ultimate finding rests." *In re Adoption of T.J.F.*, 798 N.E.2d at 874. As such, adequate findings are necessary to enable the parties "to formulate intelligent and specific arguments on review." *Id.* Moreover, the findings should permit our court to "expeditiously and effectively review the trial court's determination." *Id.*

---

[1] We note that Leslie does not challenge any of the trial court's numerous findings that similarly reiterate the testimony and opinions of Dr. Lawlor.

13

Here, the trial court's findings are specific, detailed, and clearly indicate its theory for its custody decision. The record in this case is voluminous; the reports of Dr. Ferraro and Dr. Lawlor alone span nearly 150 pages. The trial court does not repeat the testimony and opinions of the experts verbatim; rather, the trial court paraphrased the findings and information gleaned from the expert witnesses that it deemed relevant to its ultimate decision. Dr. Ferraro and Dr. Lawlor relied upon different procedures for completing their evaluations, and they reached opposite conclusions. Dr. Ross' testimony served as a useful tool for the trial court by explaining the standard practices in the psychology field with respect to custody evaluations and by revealing that Dr. Lawlor's opinion was derived, at least in part, from a flawed score on Joel's psychological test. *See Bowyer v. Ind. Dep't of Natural Res.*, 944 N.E.2d 972, 984 (Ind. Ct. App. 2011) (finding trial court's factual finding to be valid where, despite reciting the testimony of the witness' observations, the trial court referenced additional evidence to suggest that it regarded the testimony as a fact), *reh'g denied*. By recounting the three experts' testimony regarding their procedures, testing methods, results, and conclusions in its findings of fact, we find that the trial court clearly conveyed its rationale for discrediting Dr. Lawlor and agreeing with Dr. Ferraro's recommendations regarding the Child's best interests. Therefore, notwithstanding the trial court's faulty language, we find that its factual findings satisfy "the spirit of the requirement" and decline to construe them as "mere surplusage." *Perez*, 426 N.E.2d at 33.

## B. *Best Interests of the Child*

Leslie next asserts that the trial court clearly erred in finding that it is in the Child's best interests to award custody to Joel. In making an initial custody determination, there

14

is no presumption favoring either parent. Ind. Code § 31-17-2-8. Accordingly, the trial court's decision must be based on the best interests of the child. I.C. § 31-17-2-8. To ascertain the child's best interests, the trial court must "consider all relevant factors," including:

(1) The age and sex of the child.
(2) The wishes of the child's parent or parents.
(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
(4) The interaction and interrelationship of the child with:
    (A) the child's parent or parents;
    (B) the child's sibling; and
    (C) any other person who may significantly affect the child's best interests.
(5) The child's adjustment to the child's:
    (A) home;
    (B) school; and
    (C) community.
(6) The mental and physical health of all individuals involved.
(7) Evidence of a pattern of domestic or family violence by either parent.
(8) Evidence that the child has been cared for by a de facto custodian . . . .

I.C. § 31-17-2-8. Leslie does not contend that the trial court failed to consider any of the statutory best interests factors; rather, she claims that "no evidence was presented that [the Child] was doing anything but thriving in [her] care." (Appellant's Br. p. 16).

The trial court did not explicitly find that the Child's best interests would be served by awarding *physical* custody to Joel. Rather, the trial court stated that, "[a]fter considering the above findings and conclusions and all relevant factors set forth in [Indiana Code section] 31-17-2-15, the [c]ourt finds that it is in [the Child's] best interest for [Joel] to be awarded sole *legal* custody." (Appellant's App. p. 28) (emphasis added). Nonetheless, the trial court provided Leslie with parenting time on alternating weekends, identified the factors set forth in Indiana Code section 31-17-2-8 for considering best interests, and made

15

numerous findings in support thereof; therefore, we can reasonably infer that the trial court determined it would be in the Child's best interests for Joel to have both sole legal and physical custody of the Child.

Leslie argues that "the trial court ignored the uncontroverted and overwhelming evidence . . . that [she] has been the primary caretaker of [the Child], especially since Joel left the residence and moved . . . in March 2010." (Appellant's Br. p. 22). Leslie states that the trial court relied too heavily on Dr. Ferraro's opinions and failed to consider the evidence of her "superlative care of [the Child]." (Appellant's Br. p. 23). Instead, she cites the contradictory opinion of Dr. Lawlor, who believes that Leslie should have received physical custody. To this, we reiterate our long-settled tenet that it is the trial court's duty to weigh all of the evidence and determine the proper custody arrangement, and we will not find an abuse of discretion where the evidence is merely conflicting. *Periquet-Febres v. Febres*, 659 N.E.2d 602, 605 (Ind. Ct. App. 1995), *trans. denied*.

In support of its conclusion, the trial court's findings establish that the Child is a girl, born on March 19, 2008; that Joel seeks sole legal and primary physical custody; and that Leslie desires primary physical custody. Based on the Child's tender age, the trial court found little relevance in the Child's wishes. The evidence demonstrates that Joel and Leslie each spent a significant amount of time as the Child's primary caregiver, and the Child has a close bond with both of her parents. The trial court also found that N.F. and the Child have "a wonderful relationship[,]" and Leslie testified that the Child "really looks up to [A.F.]." (Appellant's App. p. 15; Transcript p. 115). Although living in Waterloo would reduce the amount of time the Child spends with her half-siblings, the trial court

found that this separation would not be detrimental to the Child. As a result of disparaging comments that Leslie made to A.F. and N.F. about Joel, A.F. and N.F. have developed a bias against Joel, and the trial court found that this could negatively influence the Child's relationship with her half-siblings and with Joel. Leslie avers that there is no evidence to support the finding that she disparaged Joel "in the children's presence" because Dr. Ferraro never indicated that the Child was present when Leslie made such statements. (Appellant's Br. p. 14). We find little merit in this contention as Leslie does not disagree that she made disparaging comments in front of A.F. and N.F., who are, in fact, her children.

Joel is currently living with his sister and brother-in-law—Judith and Bill—in Waterloo and is welcome to remain there until he is able to purchase his own home. Judith and Bill have a large house and a seventeen-acre yard, and the Child has her own bedroom. In addition to Judith, Bill, and their two sons, Joel's brother and his family also live in Waterloo. Joel's brother has two children close in age to the Child, and the Child has a great relationship with Joel's extended family. In Fishers, the Child's only family consists of Leslie and the Child's two half-siblings, but she has made friends through daycare, extracurricular activities, and church. The trial court found that the Child does well in her daycare programs both in Fishers and in Waterloo, and both parents are supportive of the Child's participation in activities that she enjoys. Leslie enrolled the Child in gymnastics in Fishers, and Joel testified that he intends to enroll the Child in a gymnastics class with her cousin in Waterloo. By all accounts, the Child is happy, intelligent, and well-adjusted.

17

Leslie asserts that, by awarding custody to Joel, the trial court penalized her for being the victim of rape and other domestic violence and for failing to report these events. We disagree. We find that the trial court acted within its discretion to place a significant amount of weight on Leslie's emotional instability and dysfunctional relationship with A.F. in determining that Joel would provide a more stable environment for the Child, but there is no basis for the assertion that the trial court faulted Leslie for being raped. The trial court's findings are further supported with evidence of Leslie's physical altercations with A.F. and that Leslie does not maintain appropriate boundaries or follow-through with disciplining the children.

The trial court also found that Leslie has deceived Joel about the Child's health on multiple occasions, has been evasive about answering Joel's questions concerning the Child's activities and the involvement of Leslie's boyfriend in the Child's life, and has been uncooperative in arranging phone calls and parenting time. Leslie contends that none of these factors "could be found to have negatively affected [the Child's] best interests" and are simply "a few isolated examples of the typical disagreement[s] that arise when families undergo a divorce and the parties are separated by large distances." (Appellant's Br. p. 13). Again, we disagree. It is in the Child's best interests to have a meaningful relationship with both of her parents. *See Johnson v. Nation*, 615 N.E.2d 141, 146 (Ind. Ct. App. 1993). This is achieved through the trial court's custody determination because Joel "is more likely to keep [Leslie] involved and informed than if the roles were reversed." (Appellant's App. p. 22).

Leslie pinpoints several of the trial court's findings as being inaccurate, including the details of Leslie's prior experience as being "raped, choked and beaten by another man in college"; the trial court's use of the word "rape" to describe the sexual molestation her brother inflicted upon A.F.; and that she did not obtain therapy for A.F. following her rape while on a family vacation in 2007. (Appellant's Br. p. 15). We agree with Leslie that, to an extent, the trial court misstates some of the evidence in these findings. The trial court may have confused the details about the separate incidents of Leslie's sexual and domestic abuse, but the evidence demonstrates that Leslie was raped when she was a teenager, which resulted in a pregnancy and subsequent abortion; she was physically abused by her high school boyfriend, who then tried to choke her during her freshman year of college; she was raped by another ex-boyfriend in college; and she was abused by her ex-husband, who, following their divorce, choked and raped her when he was drunk. Also, Leslie's brother may not have had "sexual intercourse" with A.F. to warrant the trial court's use of the word "rape," but the evidence reveals that her uncle did molest her, and although Leslie declined to pursue charges on A.F.'s behalf, he is currently incarcerated based upon his molestation of two other nieces. (Appellant's Br. p. 16). Finally, the trial court incorrectly stated that A.F. did not receive counseling following her rape in 2007 because she attended therapy with Bates from November of 2007 through September of 2008. The evidence does disclose, though, that Leslie discontinued A.F.'s therapy with Bates only two months after learning that Leslie's brother had sexually molested A.F. Because there is sufficient evidence to uphold the trial court's best interests determination exclusive of these misstatements, we find no prejudicial error and affirm the trial court's decision to award

19

custody of the Child to Joel. *See In re B.J.*, 879 N.E.2d 7, 19-20 (Ind. Ct. App. 2008), *trans. denied*.

### III. *Mandatory Psychotherapy*

Second, Leslie claims that the trial court abused its discretion by ordering that she obtain psychotherapy. Absent evidence that she suffers from a psychological disorder or otherwise poses a risk to the Child's safety, Leslie contends that the trial court lacks "the authority to direct the mental health treatment of a party." (Appellant's Br. p. 26). Leslie does not reference any authority in support of her assertion, which would generally result in our finding that this issue has been waived. *See* Ind. Appellate Rule 46(A)(8)(a). However, it appears from our search of the relevant case law that Indiana's appellate courts have not yet addressed the authority of a trial court to impose psychotherapy in a marital dissolution and custody order. Therefore, we will address Leslie's claim, waiver notwithstanding.

In its findings of fact and conclusions of law regarding "LEGAL CUSTODY AND PARENTING TIME[,]" the trial court ordered Leslie

> to become involved in her own intensive individual psychodynamically-oriented psychotherapy on at least a weekly basis . . . . The therapist providing this service shall have access to both custody evaluations. If recommended by her therapist, [Leslie] shall undergo psychiatric evaluation (to be performed by one of the professionals set forth in Dr. Ferraro's custody evaluation) and [Leslie] shall comply with any recommendations.

(Appellant's App. pp. 28-29). We first note that there is no specific statutory authority for the trial court to mandate psychotherapy as part of a dissolution decree or initial custody proceeding. *See* I.C. § 31-17-2-16 (court may order counseling for child in custody

20

proceeding); I.C. § 31-34-20-1(a)(6) (court may order parent to complete services in proceedings involving child in need of services).

We instead consider Indiana Code section 31-17-4-1(a), which provides that a non-custodial parent is entitled to exercise reasonable parenting time with his or her child "unless the court finds, after a hearing, that parenting time by the noncustodial parent *might endanger the child's physical health or significantly impair the child's emotional development*" (emphasis added). Our court has previously held that trial courts have discretion to set reasonable restrictions and conditions upon a parent's parenting time in furtherance of the child's welfare. *See Lasater v. Lasater*, 809 N.E.2d 380, 401-02 (Ind. Ct. App. 2004). Here, although the Decree does not expressly condition Leslie's parenting time upon her participation in psychotherapy, the trial court did specifically adopt Dr. Ferraro's recommendations regarding counseling. In his custody evaluation, Dr. Ferraro recommended that Leslie participate in psychotherapy and, *subject to this intervention*, she should receive the parenting time set forth in the Indiana Parenting Time Guidelines. Hence, based upon the trial court's explicit adoption of Dr. Ferraro's recommendations, we find that the trial court's decision to award standard parenting time pursuant to the Guidelines is based upon its expectation that Leslie will comply with the mandate to undergo psychotherapy.

Having determined that psychotherapy is a condition of Leslie's parenting time, we must next consider whether the evidence concerning the Child's well-being supports the trial court's imposition of this condition. *See id.* at 400-01. We find the record is replete with evidence that Leslie presents a significant risk of impairing the Child's emotional

21

development. Both Herd and Bates raised concerns about Leslie's permissive parenting style, her unwillingness to face problems, and her inability to appropriately handle conflict. Herd surmised during marital counseling that Leslie might suffer from a psychological disorder and benefit from medication, and Bates discussed that Leslie's dysfunctional relationship with A.F. may have exacerbated A.F.'s severe emotional and behavioral problems. Bates added that, without addressing her deficiencies and committing to improvement, Leslie is likely to parent the Child in the same manner.

Dr. Ferraro also made ample findings regarding the impact of Leslie's prior sexual abuse, rapes, and domestic violence on her parenting. In spite of these traumatic events, Leslie achieved success in her academic and professional undertakings, and Dr. Ferraro acknowledges that Leslie has a loving relationship with the Child and has adequately provided for her basic needs. Leslie testified that, with the support of her church and friends, she has moved on from these incidents and does not need therapy. Conversely, Dr. Ferraro explained that Leslie's unresolved traumatic experiences have manifested themselves in her parenting decisions. Her false sexual abuse allegation against Joel "suggests the potential that her perception has been altered or impacted by her own experiences in a way that could result in her concerns stemming from her own past." (Tr. p. 390). In addition, Leslie has been unable to assist A.F. to cope with her own sexual traumas. A.F. attended upwards of forty counseling sessions with Bates, but it was more than eighteen months after A.F.'s suicide attempt that Leslie first sought therapy for A.F. Just two months after A.F. revealed that Leslie's brother had sexually molested A.F. over the course of nine years, which had been covered up by other members of the family, Leslie

22

discontinued A.F.'s therapy because she had given up on any improvement in A.F.'s unmanageable behavior. Furthermore, Leslie's "[l]ow self-esteem, combined with unresolved feelings of anger or resentment," has resulted in her children's exposure to a chaotic, emotionally turbulent, and even violent home environment. (Appellant's App. p. 21).

We recognize that parents have an interest in rearing their children without undue interference from the courts, but in any child-related matter—whether it be custody, visitation, or termination of parental rights—the best interests of the child must be the primary consideration. Court-ordered psychotherapy may not be appropriate in every case, but here, where the evidence supports the mandate, we find the Child's emotional development outweighs Leslie's opposition to psychotherapy. Because the parenting time condition is based upon the trial court's endeavor to protect the Child's emotional well-being, we cannot say that it was an abuse of discretion for the trial court to order Leslie to attend psychotherapy.

## IV. *Valuation of the Marital Estate*

Third, Leslie claims that the trial court abused its discretion in its valuation of several marital assets—namely, the mortgage debt, her engagement ring, and Joel's golf clubs. The trial court has broad discretion to assign a value to the marital assets in a dissolution action, and we will not disturb the trial court's valuation absent an abuse of discretion. *Leonard v. Leonard*, 877 N.E.2d 896, 900 (Ind. Ct. App. 2007). "So long as there is sufficient evidence and reasonable inferences to support the valuation," we will find no abuse of discretion. *Id.* Even if "the circumstances would support a different

23

award," we will not substitute our judgment for that of the trial court. *Nowels v. Nowels*, 836 N.E.2d 481, 485 (Ind. Ct. App. 2005). Here, the trial court used the date of the parties' final separation—that is, when Leslie filed the petition for dissolution on February 26, 2010 (Date of Filing)—as the valuation date.

## A. *Mortgage Debt*

Leslie challenges the trial court's valuation of the mortgage debt on the marital residence. The parties do not dispute that the fair market value of the house is $245,800. The trial court found the value of the mortgage debt to be $228,487.15 as of the Date of Filing. While Joel agrees with the trial court's valuation of the mortgage debt, Leslie argues that the correct value is $274,811, which is the total mortgage payoff amount as of June 1, 2012. It is well established that it is within the sound discretion of the trial court to "select any date between the date of filing for dissolution and the date of the final hearing" upon which to value the marital assets. *Id.*

A few days after Leslie filed the petition for dissolution, Joel moved out of the marital residence, and Leslie remained there with the children. Pursuant to the Preliminary Order, Joel complied with his obligation to pay Leslie $320 per month for the expenses of the marital residence. The Preliminary Order charged Leslie with making the monthly mortgage payments, but she was unable to meet this responsibility and the bank commenced foreclosure proceedings. Leslie testified that she made approximately six payments during the two-year period between the Preliminary Order and the final hearing. As a result of Leslie's nonpayment, by June 1, 2012, the mortgage payoff had increased by

nearly $50,000—to $274,810.74. Accordingly, we find the trial court acted within its discretion to value the mortgage debt as of the Date of Filing.

In the alternative, Leslie asserts that the trial court should have, at the very least, added $7,748 to the mortgage debt valuation, "which represents the additional amount needed to pay [] off the mortgage at the [D]ate of [F]iling." (Appellant's Br. p. 27). A mortgage account statement dated February 23, 2010, indicates a principal balance of $228,487.15. Leslie also submitted a loan statement dated February 22, 2010, which reflects the same principal balance but also states that, as of December 1, 2009, Joel and Leslie were $7,748.26 past due in their mortgage payments. Leslie thus insists that this arrearage should have been added to the principal balance in calculating the total mortgage debt. We disagree. It appears from Leslie's loan statement that the past due payments and late charges are already factored into the $228,485.15 loan balance. As of the Date of Filing, a payment of $7,748.26 was necessary for Joel and Leslie to become current in their mortgage obligation, but Leslie presented no evidence to indicate that this amount was owed in excess of the stated balance. We therefore find no abuse of discretion in the trial court's valuation of the mortgage debt as $228,487.15.

B. *Engagement Ring*

Leslie next disputes the trial court's valuation of her engagement ring. Although the trial court adopted Joel's proffered value of $6,000, Leslie argues that the correct value is only $2,181. Both parties testified that Joel purchased the ring at a cost of $8,000. At Leslie's request, a gemologist wrote a letter in June of 2012, and quoted the ring as having a liquidation value of $2,181.78. On the other hand, Joel opined the value of the ring to be

25

$6,000 because the ring was appraised for insurance purposes at the time of its purchase, and he thereafter insured the ring for $10,000. In accepting Joel's valuation rather than that of Leslie, the trial court stated that "the liquidation value is not the fair market value." (Appellant's App. p. 33).

Leslie now argues that Joel "has no expertise to value jewelry" and that he "did not provide an appraisal or any record to support his self-serving valuation." (Appellant's Br. p. 29). Leslie correctly asserts that Joel did not supply supporting documentation for his suggested value; nevertheless, we find there is sufficient evidence to support the trial court's determination of value and note that Leslie's argument amounts to a request that we reweigh evidence, which we will not do. Joel testified regarding the purchase price and insurance appraisal of the ring. Although Leslie presented a more recent appraisal, the gemologist provided a quote solely as to the liquidation value of the ring, even explaining that the "[l]iquidation value is subject to change due to volatility of gold and diamond prices." (Appellant's Exh. 27). The trial court was under no obligation to find the letter of a gemologist any more credible than Joel's testimony.

Furthermore, "fair market value" and "liquidation value" are distinct methods of valuation. The fair market value is "the price at which property would change hands between a willing buyer and seller, neither being under any compulsion to consummate the sale." *City of Carmel v. Leeper Elec. Servs., Inc.*, 805 N.E.2d 389, 395 (Ind. Ct. App. 2004). On the other hand, the liquidation value is the value "of an asset when it is sold in liquidation, as opposed to being sold in the ordinary course of business" and is usually below the fair market value. BLACK'S LAW DICTIONARY 1227, 1587 (8th ed. 2004). Per

26

its discretion, the trial court elected to use a fair market value approach and valued the engagement ring at $6,000, which is within the range of values supportable by the evidence.[2]

## C. *Golf Clubs*

Lastly, Leslie contests the trial court's valuation of Joel's golf clubs. In their respective financial declarations, Joel stated that his golf club collection has a value of $1,150, whereas Leslie valued it at $879. During the pendency of the dissolution, the clubs remained at the marital residence. Prior to the final hearing, Joel retrieved some personal property from the house, at which time he noticed that several clubs were missing. Joel testified that the missing clubs had a value of $350. In its findings, the trial court accepted Joel's values and awarded $800 to Joel's share of the marital assets and $350 to Leslie's. (Appellant's App. p. 32).

Leslie requests our court to remand this matter for the trial court to adjust the value of the golf clubs because she "presented evidence that the golf clubs were worth $898.00."[3] (Appellant's Br. p. 30). Here, neither Joel nor Leslie offered any evidence, such as appraisals or receipts, to establish the value of the golf clubs; rather, they simply offered their own opinions as to their value. We first note that it is not the role of our court to reweigh conflicting evidence. Second, the record discloses that Joel previously worked as

---

[2] Leslie also asserts that the trial court should have awarded the $6,000 value to Joel. Because she did not argue this during the trial and, in fact, listed the ring as an asset she desired, we do not address this argument.

[3] Leslie cites Exhibit 27 to support this claim, but we note that Exhibit 27 identifies the golf clubs as having a value of $1,150 based upon "[Joel's] opinion." Leslie's other proposed property valuation and distribution schemes value the golf clubs at $879, and we find no indication that their value is $898.

a PGA golf professional. Based upon this evidence, the trial court could have reasonably inferred that Joel's valuation was based on his knowledge and experience in the golf domain. Finally, we find the trial court acted within its discretion because it assigned a value "within the bounds of the evidence presented." *Troyer v. Troyer*, 987 N.E.2d 1130, 1138 (Ind. Ct. App. 2013), *trans. denied*.

Leslie also asserts there is no evidence of the existence of the golf clubs that Joel alleged to be missing or that she is responsible for their disappearance. As we have previously stated, it is the role of the trial court to assess the credibility of witnesses. Unlike our court, which is limited to reviewing "a cold transcript of the record," the trial court is able to observe the witnesses' demeanor and scrutinize their testimony firsthand. *D.C. v. J.A.C.*, 977 N.E.2d 951, 956-57 (Ind. 2012). As a result, we accord considerable deference to the trial court's evaluation of credibility. *Id.* In this case, the trial court specifically determined that "it appear[ed] from the evidence that [Leslie] lost" the golf clubs. (Appellant's App. p. 32). Thus, it is clear that the trial court found Joel to be more credible, and we decline Leslie's invitation to interfere with this function of the trial court.

## V. *Division of the Marital Estate*

Finally, Leslie claims the trial court erred by failing to include certain liabilities as part of the marital estate. In a dissolution proceeding, the trial court's division of the marital estate is a two-step process: first, the trial court determines what property is to be included in the marital pot; second, the trial court must divide the property. *Thompson v. Thompson*, 811 N.E.2d 888, 912 (Ind. Ct. App. 2004), *reh'g denied*, *trans. denied*. The marital pot incorporates "all the property acquired by the joint effort of the parties" before

the marriage and up to the date of final separation. *Id. See* I.C. § 31-15-7-4. The trial court's division of the marital pot is subject to a statutory presumption of an equal split. *Thompson*, 811 N.E.2d at 912.

The division of the marital estate is a matter within the sound discretion of the trial court. *Alexander v. Alexander*, 927 N.E.2d 926, 933 (Ind. Ct. App. 2010), *trans. denied*. Upon review, we do not reweigh evidence or assess the credibility of witnesses, and we will consider only the evidence most favorable to the trial court's disposition of the marital property. *Id.* In this case, the trial court concluded "that an equitable division of the marital estate is just and reasonable." (Appellant's App. p. 37). The allocation of the real and personal property resulted in an award to Leslie of 81% of the marital estate and 19% to Joel. In order to effectuate an equal division, the trial court entered judgment in favor of Joel for $10,159.96, which Leslie was ordered to pay in monthly installments of $500.

### A. *Home Repairs*

Leslie contends that the trial court should have included the debt owed to Wolf Technical Services as a marital liability. In its Decree, the trial court denied Leslie's request to include this debt in the marital pot because it is "a post-filing expense." (Appellant's App. p. 38). In general, any debt incurred by one party after the filing date of the dissolution petition is not to be included in the marital pot. *Sanjari v. Sanjari*, 755 N.E.2d 1186 (Ind. Ct. App. 2001). According to Leslie, prior to filing for divorce, she and Joel had hired an attorney to institute legal proceedings against the former owner of the marital residence regarding "expenses related to mold remediation and reconstruction of their basement." (Appellant's Br. p. 28). As such, Leslie avers that the $2,525 debt to

29

Wolf Technical "is a jointly incurred debt that should be a marital debt because of its nature" and should be equally divided. (Appellant's Br. p. 28).

During the hearing, Joel testified that soon after he and Leslie moved into the marital residence, they learned "that it had significant problems with its basement." (Tr. p. 740). Beyond Joel's brief mention of the need for repairs, Leslie did not testify regarding the Wolf Technical debt, and the only evidence introduced regarding the necessary repairs is a vague statement from Wolf Technical with an outstanding balance of $2,525. The statement, which is dated June 8, 2011, is addressed to a law firm. It makes no reference to the marital residence or the nature of the work performed; the transactions are simply described as "Research and Analysis." (Appellant's Exh. 27). There is no indication of when the work was completed, although it does appear that there was one charge invoiced prior to the Date of Filing, which was deducted from an advance the parties had paid to the company. We find this evidence is insufficient to establish that Leslie completed and paid for repairs needed prior to the Date of Filing. *See Thompson*, 811 N.E.2d at 916.

Moreover, the trial court found that, at the time Leslie incurred this expense, "[Joel] was paying his own living expenses and child support, and paying [Leslie] $320.00 per month for expenses related to the marital residence." (Appellant's App. p. 38). Not only did Joel make monthly contributions to Leslie for house-related expenses such as the repairs at issue, but Leslie, as the sole recipient of the marital residence, will be the sole party to benefit from any equity created as the result of home repairs. Accordingly, we find no abuse of discretion in the trial court's refusal to include the Wolf Technical debt in the marital pot as a post-filing expense.

## B. *Custody Evaluation Fees*

Leslie also argues that the trial court abused its discretion by improperly dividing the custody evaluation fees.[4] In its Decree, the trial court determined that the fees of the court-appointed custody evaluator—Dr. Ferraro—should be divided equally between Joel and Leslie and found that Joel had "paid Dr. Ferraro approximately $17,000.00." (Appellant's App. p. 39). Offsetting Leslie's share of the evaluation cost by $412.50, which represents Joel's obligation to pay for half of the personal property appraisal, the trial court ordered Leslie to reimburse Joel in the amount of $8,087.50.

Leslie acknowledges her obligation to pay for half of the fees associated with Dr. Ferraro's report, which totals approximately $12,000. But, because the remaining $5,000 reflects the cost of Dr. Ferraro's appearance and testimony in court, Leslie insists that she is not responsible for paying this half as she "did not ask for Dr. Ferraro to testify. She did not call him as a witness." (Appellant's Br. p. 29). Indiana Code section 31-17-7-1(a) provides that the trial court "may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding [in a child custody action]." While this includes fees for attorneys and mediation services, the trial court has broad discretion to award other types of fees associated with maintaining or defending the action. *See In re Marriage of Boren*, 475 N.E.2d 690, 696 (Ind. 1985) (discussing nearly identical statute in dissolution article and finding fees of property appraiser "constituted an expense

---

[4] Although Leslie includes this claim in the section of her brief challenging the trial court's division of the marital estate, the custody evaluation fees are not considered debt to be included in the marital pot because they were incurred after the Date of Filing. *Fuehrer v. Fuehrer*, 651 N.E.2d 1171, 1173 (Ind. Ct. App. 1995), *trans. denied*. We address this claim as an award of fees.

of litigation necessary to 'maintaining or defending' the dissolution proceeding"). Here, the cost of Dr. Ferraro's custody evaluation is clearly a cost of maintaining or defending this custody action. Furthermore, maintaining or defending an action necessarily includes the right to cross-examine an expert witness in order to prove or discredit the reliability and accuracy of his report, and both Joel and Leslie accepted the opportunity to question Dr. Ferraro. Thus, we find the trial court acted within its discretion to divide the entire $17,000 fee, which covers both Dr. Ferraro's report and his appearance in court.

In addition, Leslie asserts that, based upon her obligation to pay for half of Dr. Ferraro's fees, Joel should likewise have been ordered to pay for half of the $3,000 expense she incurred for Dr. Lawlor's second custody evaluation. We disagree. The court appointed Dr. Ferraro and exercised its discretion to divide his cost between the parties. Leslie elected to employ Dr. Lawlor's services, and Joel chose to retain Dr. Ross. By obtaining these evaluations, Joel and Leslie were certainly maintaining or defending their respective positions in this custody battle, but it was up to the trial court's discretion to award either party with the costs of these secondary evaluations. We cannot say that the trial court abused its discretion in ordering Leslie to pay half of Dr. Ferraro's fees incurred by Joel in obtaining the *court-ordered* custody evaluation and requiring each party to bear the costs of hiring his or her additional expert.

### C. *Tax Preparation Fees*

Leslie next contends that the trial court erred by failing to include tax preparation fees totaling $378.85 in its calculation and division of the marital estate. In June of 2012, the Indiana Department of Revenue issued a tax warrant to Joel and Leslie for their failure

32

to file a state income tax return in 2008. The trial court found the balance of the tax warrant to be $864.99 and ordered that "[Leslie] shall assume and pay this debt and hold [Joel] harmless thereon." (Appellant's App. p. 35). The trial court did not discuss Leslie's accounting fees incurred in the course of preparing the tax return.

It is clear that the tax debt was incurred prior to the parties' separation, and the trial court properly included it as a marital debt subject to division. Conversely, the evidence that Leslie's purported tax preparation fees should also have been included in the marital pot is not so clear. Leslie submitted an invoice from an accounting firm for $378.85, dated February 3, 2012. The services rendered are identified as "2008 & 2009 Indiana IT-40 Tax Returns." (Appellant's Exh. 27). The tax warrant pertains solely to the 2008 tax year, but the invoice reflects a charge for the accountant's preparation of returns for 2008 *and* 2009. Additionally, Leslie testified during the hearing that Joel should "be held responsible to pay half of the state taxes that are currently due[,]" but she made no mention of the tax preparation fees. (Tr. p. 175). The trial court acted within its discretion in dividing the marital debt by assigning Leslie the responsibility of the tax warrant, and we find no abuse of discretion in the trial court's failure to include the tax preparation fees in the marital pot.

D. *Car Insurance Premiums*

Finally, Leslie contends that the trial court abused its discretion by denying her request that Joel reimburse the cost of her automobile insurance premiums. The Preliminary Order instructed Joel to "pay the costs of automobile insurance, as it currently exists." (Appellant's App. p. 46). The trial court found that, subsequent to the Preliminary Order, Leslie procured a separate policy which included coverage for A.F. The trial court

33

explained that because its intent was "for [Joel] to maintain the coverage 'as it currently exists,' the [c]ourt [did] not find that it would be appropriate to have [Joel] reimburse [Leslie]." (Appellant's App. p. 39).

Following the Preliminary Order, the insurance company required Leslie to obtain a separate policy because the insured drivers "are not living in the same state." (Appellant's Exh. 3). Leslie's premiums increased upon obtaining a separate policy, but she requested only that Joel be liable for paying the same amount that he would have been required to pay for the policy as it existed at the time of the Preliminary Order. While we recognize that Leslie was beholden to the rules of the insurance company, we nevertheless find that the trial court acted within its discretion in declining to order that Joel reimburse Leslie's insurance premiums. By adding A.F. onto her policy, Leslie completely altered the nature of the existing coverage and thereby released Joel of his duty to pay the premiums.

## CROSS-APPEAL

In addition to the items Leslie claimed were erroneously valued, Joel now claims that the trial court abused its discretion in its valuation of Leslie's 401(k) account. The trial court valued Leslie's 401(k) at $10,424.99, which is the amount she contributed to the account during the marriage. Joel maintains that the trial court should have assigned a value of "$59,933.25, which is the value closest to the [D]ate of [F]iling." (Appellee's Br. p. 31). The evidence reveals that one month prior to the Date of Filing, the balance of the 401(k) account was $56,820.36. By April 1, 2010, its value had increased to $59,933.25. At the final hearing, Leslie reported that the account was empty.

It is well settled that all marital property, including property acquired by a spouse prior to marriage, is to be included in the marital pot and divided in accordance with statute. *O'Connell v. O'Connell*, 889 N.E.2d 1, 11 (Ind. Ct. App. 2008). In adhering to the "one-pot" method of dividing marital property, the trial court should consider the entire value of the asset—not simply the asset's appreciation or depreciation over the course of the marriage. *Id.* at 11-12. Thus, prior to distribution, the trial court should have included the full value of the asset as of the selected valuation date, rather than just the amount contributed during the marriage. As a matter of law, the value of the 401(k) account for purposes of division as a marital asset does not include any appreciation occurring after the date of final separation. *Thompson*, 811 N.E.2d at 916. As such, based on its decision to use the Date of Filing, the trial court should have valued the 401(k) account to be $56,820.36, which was its value as of January 1, 2010.

Leslie, in turn, contends that she used the 401(k) funds to pay for "marital obligations during the pendency of the divorce" and that Joel consented to her depletion of the 401(k) account, but we find these arguments relate to the trial court's *division* of the marital assets rather than its determination of *value*. (Appellant's Reply Br. p. 7). We agree with Leslie that, "absent proof of asset dissipation," the trial court should not divide assets that were "used to satisfy marital debts prior to dissolution" as marital property. *Quillen v. Quillen*, 659 N.E.2d 566, 574 (Ind. Ct. App. 1995), *adopted in part, vacated in part*. Dissipation is established by evidence of "[w]aste and misuse." *In re Marriage of Coyle*, 671 N.E.2d 938, 943 (Ind. Ct. App. 1996). It typically involves "frivolous,

35

unjustified spending . . . for a purpose unrelated to the marriage and does not include the use of marital property to meet routine financial obligations." *Id.*

> Here, the trial court found that Leslie
>
> willfully and intentionally violated the mutual restraining order as set forth in the Preliminary Order by liquidating her Chase 401(k) savings account without court approval. This liquidation has had a substantial impact on the [c]ourt's ability to divide the marital estate because one of the main assets of the parties no longer exists. [Leslie] did not use any of the liquidated funds to preserve the other major asset, the marital residence. She . . . did not use any of the liquidated funds to make mortgage payments.

(Appellant's App. pp. 38-39). The trial court found that Leslie depleted the 401(k) account in order to purchase A.F. a car, make repairs to A.F.'s car, pay the fees of her attorney and Dr. Lawlor, purchase and install carpet in the marital residence, and pay off credit cards. Leslie does not argue that these expenditures were "reasonable and necessary" to meet routine financial obligations or for purposes related to the marriage. *Balicki v. Balicki*, 837 N.E.2d 532, 540 (Ind. Ct. App. 2005), *trans. denied*. Even though we find the trial court relied upon the incorrect value, it is clear that the trial court's purpose in awarding the 401(k) account to Leslie as an asset worth $10,424.99, despite the fact that it had no actual value, was to offset her dissipation of marital assets in Joel's favor. *See* I.C. § 31-15-7-5(4). This award effectively reduced Leslie's share of the marital estate to less than 50%. Accordingly we find the trial court erred in determining the value of the 401(k) account and remand with instructions for the court to enter a value of $56,820.36.

## CONCLUSION

Based on the foregoing, we conclude that the trial court did not abuse its discretion in awarding custody of the Child to Joel. We further conclude that the trial court neither

36

abused its discretion in its valuation of the mortgage debt, engagement ring, and golf clubs, nor in its division of debts and award of fees relating to home repairs, custody evaluations, tax return preparation, and car insurance premiums. We do conclude, however, that the trial court abused its discretion in its valuation of Leslie's 401(k) account.

Affirmed in part, reversed in part, and remanded with instructions.

ROBB, J. and BRADFORD, J. concur