## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 27 2017, 8:33 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer A. Joas
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Marjorie Newell
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

C.M. (Minor Child)

And

H.M. (Mother),

*Appellant-Respondent,*

      v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

June 27, 2017

Court of Appeals Case No.
40A05-1701-JT-62

Appeal from the Jennings Circuit Court

The Honorable Jon W. Webster, Judge

Trial Court Cause No.
40C01-1608-JT-36

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, H.M. (Mother), appeals the trial court's Order terminating Mother's parental rights to her minor child, C.M. (Child).

We affirm.

## ISSUE

Mother raises one issue on appeal, which we restate as: Whether the trial court clearly erred in terminating her parental rights to the Child.

## FACTS AND PROCEDURAL HISTORY

Mother and M.A. (Father)[1] are the biological parents of the Child, born on March 11, 2013. Following the Child's birth, Mother was the sole custodian, and it appears that Father has had little or no involvement in the Child's life. Mother and the Child lived with the Child's maternal grandmother in North Vernon, Jennings County, Indiana.

On February 26, 2014, Mother took the eleven-month-old Child to the emergency room because "he had been screaming and inconsolable" for several hours. (Appellant's App. Vol. II, p. 32). In addition, the Child also presented with a rash on his face, and he tugged at his penis and ear and favored one leg as if the other was in pain. Pain medication was administered, and when the

---

[1] A DNA test completed on July 1, 2014, established that Father is the Child's biological parent. His parental rights to the Child were terminated on December 7, 2016. Father does not participate in this appeal.

cause of the Child's discomfort could not be isolated, the Child was transferred to Peyton Manning Children's Hospital. There, the Child was given a urinalysis and tested positive for amphetamine, methamphetamine, opiates, and barbiturates. The pain medication that had been administered at the emergency room explained the presence of the opiates and barbiturates, but there was no medical basis for the presence of amphetamine or methamphetamine in the Child's system. Thus, the hospital reported to the Indiana Department of Child Services (DCS) that the Child suffered an amphetamine intoxication. When DCS questioned Mother as to how the Child might have ingested amphetamine or methamphetamine, "her story kept trying to change him [*sic*]. [DCS] never really got a straight answer of what happened of how [the Child] . . . came into contact with the drugs." (Tr. Vol. II, pp. 34-35). Fortunately, the Child suffered no long-term consequences from ingesting methamphetamine. Nevertheless, DCS immediately removed the Child from Mother's custody and placed him in the care of a maternal aunt. The Child was later moved to the care of his paternal aunt and her husband, where the Child presently resides.

[6] On March 4, 2014, DCS filed a petition alleging the Child to be a Child in Need of Services (CHINS).[2] On March 26, 2014, the State filed criminal charges against Mother regarding the Child's ingestion of methamphetamine: neglect of a dependent as a Class C felony and neglect of a dependent as a Class D

---

[2] The CHINS petition was amended on August 20, 2014, to add allegations regarding Father, whose paternity was not determined until July 1, 2014.

felony. On April 10, 2015, the trial court conducted a dispositional hearing. On April 23, 2015, the trial court issued a dispositional order, directing Mother to comply with a parental participation plan. In relevant part, Mother was ordered to enroll and participate in all services recommended by DCS and other service providers; obtain suitable, safe, and stable housing; secure and maintain a legal and stable source of income; refrain from consuming any illegal substances; engage in a home-based counseling program; complete a parenting assessment and all ensuing recommendations; complete a substance abuse assessment and successfully complete all recommended treatment; submit to random drug screens; and successfully complete a domestic violence assessment and all recommendations. On May 28, 2015, more than a year after the Child was removed from Mother's care, the trial court adjudicated him a CHINS.

[7] Soon after the Child's removal, DCS began referring Mother for services—such as home-based case management, a life coach, and substance abuse treatment for Mother's apparent methamphetamine problem. Initially, Mother complied with her case plan: she attended therapy, met with her family support specialist for parenting skills and other resources, and she regularly visited with the Child. However, by the fall of 2014, service providers had lost contact with Mother, and she was consistently testing positive for amphetamine and methamphetamine. Thus, Mother and her therapist agreed that an in-patient treatment program "would be best for her in order to detox and get a fresh start." (Tr. Vol. II, p. 40). Mother was enrolled in a thirty-day program at a facility in Louisville, Kentucky; however, Mother left the facility within her first

forty-eight hours unbeknownst to DCS and "against the doctor's . . . wishes." (Tr. Vol. II, p. 41). When DCS finally learned that Mother had discontinued in-patient treatment, Mother stated that she "couldn't bear to be away from her [C]hild for that length of time." (Tr. Vol. II, p. 41). Yet, Mother did not arrange to have visitation with the Child until several weeks after she left the program.

[8] Although Mother continued to test positive for methamphetamine, she occasionally had negative drug screens as well. However, DCS indicated that there were times when Mother could not be located to submit to screens. In fact, at one point during the case, Mother seemingly disappeared—from DCS as well as her family—for approximately two and one-half months. It was later discovered that Mother was in a relationship involving "severe domestic violence" and that her boyfriend had been "somewhat holding her hostage." (Tr. Vol. II, p. 42). It was also reported that during Mother's "back and forth relationship" with this "[v]ery dangerous man," he began "stalking" Mother and "made death threats to her and the Child." (Tr. Vol. II, p. 48). Accordingly, DCS offered certain domestic violence services, but Mother "did not follow through." (Tr. Vol. II, p. 48).

[9] With respect to other aspects of her case plan, Mother worked various jobs, but she struggled to maintain stable employment. On multiple other occasions, Mother reported to DCS that she was employed, but when DCS attempted to verify, the employers reported that Mother was not employed or had never been employed with them. Also, while she kept her mother's address as her

permanent mailing address, Mother was gone for long periods of time, so DCS was never quite sure where she was living at any given time. At some point, Mother lost her driver's license and had to rely on her mother and others for transportation to work and to visit with the Child. On June 4, 2015, the trial court changed the Child's permanency plan of reunification to a plan for terminating Mother's parental rights to allow for the Child to be adopted.

[10] Although there were periods of inconsistency in visits, Mother generally maintained contact with the Child. After a conflict arose between Mother and the Child's relative placement, DCS instituted supervised visitation. During those occasions, the visitation supervisor noted that Mother was always very engaged with and loving toward the Child. She tended to his physical and emotional needs during the visits, and their bond was evident.

[11] By mid-2015, Mother acknowledged that she needed help with her substance abuse addiction. With the Child as "her primary motivator to make . . . progress," Mother researched in-patient treatment facilities and was accepted into a program in California. (Tr. Vol. II, p. 16). On September 1, 2015, Mother left to attend the ninety-day residential treatment program. While there, Mother attended group and individual therapy and complied with regular drug screens per the program's zero-tolerance drug policy. Mother also obtained a job working for Panera Bread, and she maintained contact with DCS. Mother successfully completed the program and then remained there for another month for additional support. When Mother returned to Indiana at the beginning of 2016, she resumed treatment with her therapist and "was doing

well . . . maintaining sobriety." (Tr. Vol. II, p. 10). She was also "very much" involved in her case with DCS and was able to transfer her employment to a Panera Bread chain in Columbus, Indiana. (Tr. Vol. II, p. 59). Due to Mother's apparent progress, the trial court, upon DCS' request, adjusted the permanency plan to allow for consideration of a guardianship/third party custody alternative.

[12] Within a few months, Mother's participation again decreased. DCS once again struggled to locate her at times and could not obtain regular drug screens. Mother quit her job. In May, she reported to her therapist "that she was struggling with substance abuse issues again," and she provided multiple drug screens that tested positive for methamphetamine. (Tr. Vol. II, p. 10). Mother requested placement in an intensive out-patient program, but she did not follow through. DCS moved to withdraw its motion to modify the permanency plan to allow for consideration of a guardianship or third party custody alternative. The trial court agreed and ordered that the permanency plan would be termination of parental rights and adoption of the Child. In her pending criminal case, on April 28, 2016, Mother pled guilty to Class D felony neglect of a dependent in exchange for the dismissal of the Class C felony charge. On May 31, 2016, the trial court entered a judgment of conviction and imposed a suspended sentence of eighteen months.

[13] Thereafter, Mother continued to visit with the Child, but she also continued to abuse methamphetamine and did not otherwise engage with her case plan. On August 8, 2016, DCS filed a petition to terminate Mother's parental rights to

the Child. Four days later, Mother was alleged to have violated her probation after she tested positive for amphetamine and methamphetamine and admitted to using marijuana, and her probation revocation hearing was scheduled to occur shortly after the hearing on DCS' petition to terminate her rights. Despite failing drug screens through the end of August 2016, on October 6, 2016, just two weeks prior to the termination hearing, Mother went to the DCS office and requested that she be tested; it was negative for controlled substances.

[14] On October 20, 2016, the trial court conducted a hearing on DCS' petition to terminate Mother's parental rights. Mother's therapist and life coach both testified regarding Mother's failure to fully address her substance abuse and lack of stable housing, employment, and transportation. DCS and the Child's guardian *ad litem* submitted evidence that the Child is thriving in his relative placement (his paternal aunt and her husband plan to adopt him) and that it would be in the Child's best interest to terminate Mother's parental rights. On December 7, 2016, the trial court issued an Order terminating Mother's parental rights. The trial court concluded, in relevant part, that there is a reasonable probability that the conditions which necessitated the Child's removal and continued placement outside the home will not be remedied by Mother, that the continuation of the parent-child relationship poses a threat to the Child's well-being, and that termination of Mother's parental rights is in the Child's best interests.

[15] Mother now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

Mother challenges the trial court's termination of her parental rights. It is long established that "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). In fact, the Fourteenth Amendment to the United States Constitution safeguards "the traditional right of parents to establish a home and raise their children." *Id.* Nevertheless, "parental rights are not absolute and must be subordinated to the child's interests." *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1122 (Ind. Ct. App. 2013) (internal quotation marks omitted) (quoting *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010)). Parental rights may be terminated if the "parents are unable or unwilling to meet their parental responsibilities." *In re G.Y.*, 904 N.E.2d at 1259-60. We recognize that the termination of a parent's rights is "an extreme measure and should only be utilized as a last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015) (internal quotation marks omitted).

When reviewing a trial court's termination of parental rights, our court neither reweighs evidence nor assesses the credibility of witnesses. *In re G.Y.*, 904 N.E.2d at 1260. Instead, we will "consider only the evidence and reasonable inferences that are most favorable to the judgment." *Id.* Additionally, the trial

court issued specific findings of fact and conclusions thereon. As such, we must apply the two-tiered standard of review set forth in Indiana Trial Rule 52(A): "[f]irst, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." *Id.* We "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). We will find clear error only "if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re G.Y.*, 904 N.E.2d at 1260 (quoting *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005)).

## II. *Termination Statute*

[18]  In order to terminate a parent's rights, DCS must prove, in relevant part, that a child has been removed from the home for a specific period of time, and

> (B) that one (1) of the following is true:
>     (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>     (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>     (iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS].
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS is required to prove each of these elements by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d at 1260. Mother concedes that DCS has established that the Child has been removed from her care for the requisite period of time and that there is a satisfactory plan in place for the Child's care. Thus, Mother argues that DCS failed to prove that there is a reasonable probability either that the conditions that resulted in the Child's removal and ongoing placement out of the home will not be remedied or that the continuation of the parent-child relationship poses a threat to the Child,[3] and that termination is in the Child's best interests.

## A. *Remediation of Conditions*

Mother contends that the trial court's conclusion that there is a reasonable probability that the conditions which led to the Child's removal and his continued placement out of the home will not be remedied is not supported by sufficient evidence. In determining whether there is a reasonable probability that conditions will not be remedied, we must identify what conditions led to the Child's "placement and retention" outside of the home and subsequently determine whether there is a reasonable probability that those conditions will not be remedied. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231

---

[3] Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, such that DCS need only prove one of the three elements listed. *See In re A.K.*, 924 N.E.2d 212, 220-21 (Ind. Ct. App. 2010), *trans. dismissed*. Here, DCS did not allege that the Child has been twice adjudicated a CHINS. Thus, the relevant inquiry is whether DCS established the existence of a reasonable probability either that the conditions resulting in the Child's removal or continued placement outside the home will not be remedied *or* that the continuation of the parent-child relationship poses a threat to the Child's well-being.

(Ind. 2013). In making these decisions, "the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions—balancing a parent's recent improvements against habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (citation omitted) (internal quotation marks omitted) (quoting *Bester*, 839 N.E.2d at 152; *K.T.K.*, 989 N.E.2d at 1231). "Habitual conduct may include 'criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.'" *K.E.*, 39 N.E.3d at 647. DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need only establish that there is a reasonable probability that the parent's behavior will not change." *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013) (internal quotation marks omitted), *trans. denied*.

[20] Mother argues that the trial court's determination cannot stand because there is insufficient evidence to support six findings that concern whether she is likely to remedy conditions. Those findings provide:

> 27. Mother lost all contact with the DCS in early 2016.
> * * * *
> 31. Mother reinitiated her services with [her therapist] in May of 2016, stating that she was struggling with using methamphetamine again. At that time, [the therapist] recommended that she re-engage in [intensive out-patient treatment].
> * * * *
> 38. Mother has not completed her [intensive out-patient

treatment] that was recently recommended by [her therapist]. Mother has also attended only four individual therapy sessions since January of 2016.

* * * *

40. Mother has failed to fully address her substance abuse issues.

* * * *

44. Mother had sporadic and inconsistent contact with the DCS.

* * * *

47. Mother and Father have made no consistent progress towards facilitating reunification with the [C]hild.

(Appellant's App. Vol. II, pp. 42-43).

[21] According to Mother, contrary to the trial court's finding, she maintained contact with DCS and service providers, and while her participation "decreased" in the spring of 2016, there is no evidence that "it was non-existent." (Appellant's Br. p. 20). With respect to DCS' testimony that Mother did not consistently maintain contact, Mother shifts the blame to DCS because "regular contact [would have been] almost impossible with the turnover of case managers on her case." (Appellant's Br. p. 23). Additionally, Mother contends that she reinitiated therapy in January of 2016 and that it was she who requested intensive out-patient treatment rather than it being a recommendation of her therapist. Mother further insists that she "has continually addressed her substance abuse issues" by seeking out her own therapist and completing a program in California. (Appellant's Br. p. 22). Mother acknowledges that she suffered a methamphetamine relapse in 2016 but claims that "she was addressing this relapse by seeking out her own services." (Appellant's Br. p. 22). Mother points out that "[h]er most recent drug screen on October 6, 2016,

was clean. Mother was not in denial. She was actively addressing her substance abuse issues." (Appellant's Br. pp. 22-23) (citation omitted). Finally, Mother notes the efforts she undertook toward reunification, including completing in-patient treatment, finding a job in California that she transferred to Indiana, that she "was clean and sober for approximately eight (8) months and made significant progress until her relapse in May [of] 2016," and her recent efforts to individually address the relapse. (Appellant's Br. p. 24).

We first note that, in large part, Mother's argument appears more akin to a request that we reweigh the value of the evidence supporting these findings rather than a contention that there is no basis in the record to support such findings. Namely, Mother's arguments regarding her partial compliance at various periods throughout the case do not negate the trial court's findings that she lacked consistency and failed to follow through with her case plan. Moreover, "even if [Mother] is correct that the [trial] court incorrectly based its decision to terminate [her] parental rights on deficient or contradictory findings, provided there exist at least some valid findings to support the trial court's conclusions, erroneous findings will not prove fatal." *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. Here, the trial court issued fifty-two findings, of which Mother challenges only six as they relate to this statutory element. We find that the unchallenged findings sufficiently establish that there is a reasonable probability that the conditions resulting in the Child's removal and her continued placement outside the home will not be remedied. Specifically, the trial court found that

the Child was removed from Mother's custody after he tested positive for amphetamine and methamphetamine. Thereafter, the trial court found that Mother tested positive for methamphetamine throughout the duration of the CHINS case, with intermittent periods of sobriety. The trial court found that Mother failed to complete substance abuse treatment following her last relapse, she lacked stable employment, and she failed to complete other recommended services.

[23] The trial court's findings are fully supported by the record. Between the time the Child was removed and the hearing on DCS' termination petition, two years and eight months elapsed. During that time, and despite the efforts of both Mother and DCS to combat her addiction, Mother could not *maintain* sobriety. After completing an intensive 120-day treatment program in California, Mother relapsed within a few months of returning to Indiana. Thereafter, she sought help from her therapist but failed to take advantage of the follow-up services that were offered. Mother's therapist explained that Mother has not adequately addressed her substance abuse issues and that she prefers to "try and accomplish [her] goals and tasks on her own" rather than accept assistance from service providers. (Tr. Vol. II, p. 18). Mother waited until just before the termination hearing to renew her efforts for sobriety. Despite Mother's negative drug screen two weeks before the termination hearing, her history of relapse is a strong predictor of her future habits. *See K.T.K.*, 989 N.E.2d at 1234 (It is within the discretion of the trial court to

"disregard the efforts Mother made only shortly before termination and to weigh more heavily Mother's history of conduct prior to those efforts.").

[24] Furthermore, Mother never obtained stable employment. She worked a few short-term jobs at the beginning of the case and later found a job at Panera Bread while in California. She was able to transfer this employment to Indiana, but she quit her job in April of 2016 due to lack of transportation. Mother stated that she lost her driver's license prior to the Child's removal and testified that she could not renew her license until she paid $1,300 in damages that resulted from an accident. While Mother claimed that she had stable housing with her mother, DCS actually raised Mother's housing situation as a concern in light of the fact that the Child was living with Mother and his maternal grandmother at the time he ingested the methamphetamine. The Child's guardian *ad litem* also found the housing inappropriate, noting that Mother's mother "is very protective of her, and I don't know that she is capable of stepping up to protect [the Child] if that would take place." (Tr. Vol. II, p. 126).

[25] Although Mother has attempted to shift some of the blame for her relapse and her limited access to the Child to DCS, the fault for the Child's removal and continued placement out of the home falls squarely on Mother's shoulders. While in Mother's care, the eleven-month-old Child somehow accessed and ingested methamphetamine, and, as noted by the Child's guardian *ad litem*, Mother has demonstrated a "seeming inability to accept responsibility" for this incident. (Appellant's App. Vol. II, p. 36). Fortunately, the Child did not

suffer long-term consequences. Yet, this incident was not enough of a wake-up call for Mother to make permanent changes in her life for the Child's sake. Accordingly, there is sufficient evidence to support the trial court's conclusion that there is a reasonable probability that the conditions resulting in the Child's removal and continued placement out of Mother's care will not be remedied.[4]

## B. *Best Interests*

[26] Mother claims that there is insufficient evidence to support the trial court's conclusion that termination of her parental rights is in the Child's best interests. The purpose of terminating a parent-child relationship is to protect the child, not to punish the parent. *In re C.C.*, 788 N.E.2d 847, 855 (Ind. Ct. App. 2003), *trans. denied*. Thus, while "[c]lear and convincing evidence need not reveal that the continued custody of the parent . . . is wholly inadequate for the child's very survival[,] . . . it is sufficient to show . . . that the child's emotional and physical development are threatened by the respondent parent's custody." *K.T.K.*, 989 N.E.2d at 1234-35 (first and fourth alterations in original) (quoting *Bester*, 839 N.E.2d at 148). When considering whether termination would be in a child's best interests, the trial court must "look beyond the factors identified by [DCS] and . . . look to the totality of the evidence." *A.D.S.*, 987 N.E.2d at 1158. "The trial court need not wait until the child is irreversibly harmed such that the

---

[4] Having found that there is sufficient evidence of a reasonable probability that conditions will not be remedied, we need not address the alternative element of Indiana Code section 31-35-2-4(b)(2)(B) regarding whether the continuation of the parent-child relationship poses a threat to the Child's well-being. *See In re A.K.*, 924 N.E.2d at 220-21 (discussing that Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, such that only one of the listed factors need be established).

child's physical, mental and social development is permanently impaired before terminating the parent-child relationship." *K.T.K.*, 989 N.E.2d at 1235. It is well established that "[p]ermanency is a central consideration in determining the [child's] best interests." *Id.* (alterations in original) (quoting *In re G.Y.*, 904 N.E.2d at 1265).

[27] Mother first challenges the trial court's finding that

> [DCS] believes that adoption is in the [C]hild's best interests. The Guardian Ad Litem . . . also echoed that adoption and termination of parental rights is in the [C]hild's best interests. The Guardian Ad Litem also filed a written report with the [c]ourt on October 18, 2016, which is made a part hereof by reference, and which expresses the same sentiment as her testimony.

(Appellant's App. Vol. II, p. 43). According to Mother, this finding is merely a "recitation of the testimony of [DCS] and the [guardian *ad litem*]." (Appellant's Br. p. 24). Because "[f]indings of fact are a mechanism by which a trial court completes its function of weighing the evidence and judging witnesses' credibility," a trial court "does not find something to be a fact by merely reciting that a witness testified to X, Y, or Z.' Rather, the trier of fact must find that what the witness testified to is the fact." *Pitcavage v. Pitcavage*, 11 N.E.3d 547, 553 (Ind. Ct. App. 2014). Thus, "where a trial court's findings are merely recitations of a witness' testimony, they cannot be construed as 'true factual determinations.'" *Id.* Rather, unless "the trial court has adopted the witness'

testimony," we will treat findings that recite testimony "as 'mere surplusage' rather than harmful error." *Id.*

[28] We agree with the State that the trial court's finding does not explicitly recite testimony, and "it appears that the trial court merely intended to draw attention to and adopt the recommendations of [the guardian *ad litem*] and [DCS]." (State's Br. p. 26). Regardless, our court has previously found that it would defeat the purpose of Indiana Trial Rule 52 to discard findings that "provide the parties and any subsequent reviewing court with a comprehensive theory upon which the case was decided." *Pitcavage*, 11 N.E.3d at 558. "Parties 'have a legal right to know the evidentiary bases upon which the ultimate finding rests.'" *Id.* Here, the trial court's finding serves to explain its rationale for reaching its ultimate conclusion; we find no error.

[29] Regarding the sufficiency of the evidence supporting the trial court's determination, Mother concedes that both DCS and the Child's guardian *ad litem* advocated that termination of her parental rights was in the Child's best interests. Mother also acknowledges that the Child "was adjusted and bonded" to his relative placement. (Appellant's Br. p. 28). However, Mother argues that, "[w]hile [she] is appreciative of the care [the Child] received in relative placement, this does not mean that [the Child's] best interests are served by severing his ties with his biological [M]other which in turn also severs his rights with his maternal grandmother." (Appellant's Br. p. 29). Rather, Mother contends that she had "a strong bond with [the Child,]" and "[w]ith [her] on the right track, there would be no harm in providing her with some additional time

to ensure she had recovered from her May relapse. She acknowledged her relapse[], she addressed her relapse and her most recent drug screen was clean. Visitation was ongoing and productive." (Appellant's Br. p. 29). Mother insists that, even though "[t]here is no guarantee that [she] will be successful[,]" the trial court's termination Order should be reversed in lieu of a guardianship to afford Mother additional time to combat her addiction. (Appellant's Br. p. 30).

[30] At the time of the termination hearing, the Child had been removed from Mother's care for nearly three years, during which time the Child bonded with his relative placement while Mother continued to abuse methamphetamine and disregard her case plan. Both DCS and the Child's guardian *ad litem* recommended that termination of Mother's parental rights was necessary for the Child's best interests, and it is well established that "the recommendation by both the [DCS] case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *A.D.S.*, 987 N.E.2d at 1158. Given the substantial time that had already elapsed, the trial court was under no obligation to further delay permanency. There is sufficient evidence to support the trial court's determination regarding the Child's best interests.

## CONCLUSION

[31] Based on the foregoing, we conclude that the trial court did not clearly err in terminating Mother's parental rights as there is clear and convincing evidence to support the trial court's determinations that there is a reasonable probability

that Mother will not remedy the conditions resulting in the Child's removal and continued placement out of the home and that termination is in the best interests of the Child.

[32] Affirmed.

[33] Najam, J. and Bradford, J. concur