

FILED

Nov 14 2019, 6:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

A. David Hutson
Hutson Legal
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

Donald A. Pierce,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent.*

November 14, 2019

Court of Appeals Case No.
18A-PC-2848

Appeal from the Crawford Circuit
Court

The Honorable Sabrina R. Bell,
Judge

Trial Court Cause No.
13C01-1204-PC-1

**Najam, Judge.**

## Statement of the Case

Donald A. Pierce appeals the post-conviction court's denial of his petition for post-conviction relief. Pierce raises five issues for our review, which we restate as the following two issues:

1. Whether the post-conviction court's findings and conclusions are adequate.

2. Whether the post-conviction court clearly erred when it found and concluded that Pierce had not received ineffective assistance from his trial counsel.

We affirm.

## Facts and Procedural History

The facts underlying Pierce's multiple child molesting convictions were detailed by this Court in his direct appeal:

> The facts most favorable to the jury's verdict indicate that J.W. was born on October 10, 1995. Her parents eventually divorced, and J.W. lived with her mother, Michelle. Michelle began dating Donald A. Pierce, and around the time J.W. was turning ten years old, Pierce moved into the home J.W. shared with her mother. Due to Michelle's work schedule, Pierce regularly spent time alone with J.W.
>
> One day, in April of 2006, Pierce was home alone with J.W. when he began touching her on her vagina through her clothes. Pierce then asked J.W. if she wanted to play a game. Pierce instructed J.W. to take off her clothes and lie on the couch. Pierce removed his clothes, laid on top of J.[W]., and put his "private" on her "private." Pierce then began to move up and down on top of J.W. After Pierce was finished, J.W. discovered that her "private" was all wet. J.W. felt disgusted.
>
> Pierce and J.W. played that "game" again the following weekend. They played the game approximately every other weekend, when J.W. was not visiting her father, for over one

year. On some occasions, Pierce put his mouth on J.W.'s "private." On some occasions, Pierce put his penis inside J.W.'s "private." And, on some occasions, Pierce touched J.W.'s "private" with his hand.

*Pierce v. State*, No. 13A04-0908-CR-480, 2010 WL 4253698, at *1 (Ind. Ct. App. Jan. 6, 2011) (citations omitted), *summarily aff'd in relevant part and vacated on other grounds*, 949 N.E.2d 349, 351 (Ind. 2011). On direct appeal, we affirmed Pierce's convictions and remanded with instructions for the trial court to correct a sentencing error. *Id.* However, on transfer, our Supreme Court exercised its discretion to revise Pierce's sentence pursuant to Indiana Appellate Rule 7(B). 949 N.E.2d at 352-53. In all other respects, our Supreme Court declined to review our Court's resolution of Pierce's appeal. *Id.* at 351.

[4] Thereafter, Pierce filed an amended petition for post-conviction relief in which he alleged that he had received ineffective assistance from his trial counsel. In particular, Pierce first alleged he had received ineffective assistance because his

> trial counsel failed to investigate potential exculpatory evidence. She failed to obtain medical and/or psychological notes and/or police reports that would have included information that could have been used to impeach J.W. Pierce's trial counsel failed to conduct a full fact investigation and to call witnesses who could have supported Pierce's innocence.

Appellant's App. Vol. 2 at 54. He further alleged that his trial counsel had rendered ineffective assistance when she had "failed to object to child abuse syndrome evidence and other prejudicial evidence." *Id.* And he alleged that his

counsel had ineffectively failed to "withdraw from Pierce's representation when a personal conflict of interest arose during the trial." *Id.*

[5] Following an evidentiary hearing, the post-conviction court rejected each of Pierce's three alleged bases of ineffective assistance of trial counsel. Regarding Pierce's claim that his trial counsel had failed to investigate, the post-conviction court found and concluded as follows:

> 28. Trial [c]ounsel testified that she believed she had obtained the child's mental health records and would have passed them on if she had them in her possession.
>
> 29. The counseling records were admitted as an exhibit at the post-conviction hearing. No evidence was admitted that showed that[,] had the records been admitted, the outcome of the trial would have been different.
>
> 30. Trial counsel testified that she did not subpoena the Kosair [Hospital] records because, based on her experience, she did not expect anything useful to be found in those records. The records did not reveal anything that would indicate a change in the outcome of the trial.
>
> 31. Kosair Hospital records were admitted as an exhibit at the post-conviction hearing and contained the following information:
>
>> a. The records state that "Pt. disclosed to paternal grandparents that her mother's boyfriend had been in bed with her '3 or 4 times.' She states she woke up from sleep with him on top of her. Las[t] time was about 2 months ago. Had her first period about 1 month ago?["]

b.  The records also state "11 y/o Caucasian . . . being allegedly sexually assaulted by mom's boyfriend.  Has happened several times over last few months [indecipherable.]  He puts his private in her private . . . puts [sic] like to have a baby . . . ."

* * *

32.  Trial [c]ounsel testified she attempted to have an expert witness, a psychiatrist from Indianapolis, to try to find something to say that what [Pierce] was saying was the truth.

33.  Trial [c]ounsel testified she made the decision not to call the witness because his testimony would have been very damaging.

34.  Further, she kept the information as attorney work product.

35.  Trial [c]ounsel testified that Amy Razor admitted she would perjure herself and give [Pierce] an alibi.

36.  Trial [c]ounsel testified her own witnesses had nothing to add.

* * *

*Failure to Subpoena Kosair Records*

34.  Trial counsel did not subpoena the child's medical records from Kosair Hospital[] because[,] in her experience, there was nothing of consequence that would come from the records.

35.  The records from Kosair Hospital were admitted at the post-conviction hearing.  There was no evidence admitted that the

admission of the records would have changed the outcome of the trial.

* * *

*Failure to Subpoena Counseling Records*

37. Trial counsel believed she had obtained all of the child's mental health records, and [she] would have passed them on if she had them in her possession.

* * *

39. Trial [c]ounsel testified that she did obtain the mental health records. There was no evidence presented that the mental health records would have been admitted into evidence or that the admission of the counseling records would change the outcome of trial.

[*Failure to Call Witnesses*]

40. Trial counsel's failure to call witnesses is a matter of strategy on counsel's part . . . .

41. Trial [c]ounsel chose not to call the previously mentioned witnesses because they had nothing to add and she had a duty to prevent putting what she knew to be false information before the Court.

*Id.* at 151-52, 159-60.

[6]     Regarding Pierce's claim that his trial counsel had rendered ineffective assistance by failing to object to the admission of certain evidence at trial, the post-conviction court found and concluded as follows:

> 21.  Trial [c]ounsel testified the whole defense was that the victim was a liar.
>
> 22.  Trial [c]ounsel testified that victim's therapist, Teresa Faulkner, believed the victim.
>
> 23.  At trial, the State, without objection from trial counsel, elicited testimony from Teresa Faulkner . . . as to the types of behaviors exhibited in children who have been abused, the profile of a typical child molesting victim, and the way that abuse by a child molester begins.
>
> 24.  Trial counsel did not object to this testimony because, based on her experience, including observations of that particular trial court judge, she did not think such an objection would be sustained.
>
> 25.  Trial [c]ounsel testified she did not cross-examine the therapist and wanted her off the stand quickly.
>
> 26.  Trial [c]ounsel stated the therapist believed [Pierce] was guilty and she was not going to change her mind.  The more the therapist was on the stand, the more damage she would be doing to [Pierce].
>
> 27.  Trial [c]ounsel's testimony is clear she made strategic decisions regarding Ms. Faulkner's testimony.

* * *

19.   Thomas Williams, Michelle Williams, and Debra Young all testified to victim's allegations prior to the victim testifying herself.

20.   "Drumbeat repetition" is the repetition of a victim's out-of-court statements prior to the victim's own testimony. *Stone v. State*, 535 N.E.2d 534 (Ind. Ct. App. 1989); *Modesitt v. State*, 578 N.E.2d 649 (Ind. 1991); *Kindred v. State*, 973 N.E.2d 1245 (Ind. Ct. App. 2012).

21.   The danger of "drumbeat repetition" is that, where the child victim's credibility is of critical importance and her story is repeated over and over by adults, the victim's story becomes increasingly unimpeachable as each adult added his or her personal eloquence, maturity, emotion and professionalism to the victim's out-of-court statements. *Stone v. State*, 535 N.E.2d at 540-541.

22.   Thus, an objection to drumbeat repetition of a victim's out-of-court statements will be sustained where the child victim's credibility is of critical importance and her story is repeated over and over by adults before the jury hears her testify. *Id.*

23.   Trial [c]ounsel testified that she had observed the trial court judge in prior child molest cases and was familiar with his rulings and what kind of testimony he allowed in. She stated she did not object to try and draw any more attention to that testimony.

24.   Trial [c]ounsel's decision not to object to drumbeat testimony was a trial strategy and does not meet the standard of ineffective assistance of counsel. Furthermore, there was no

evidence presented that showed the verdict would have been different if she made those objections.

25. The Court concludes that [t]rial [c]ounsel strategically chose not to object . . . .

*Child Sexual Abuse Syndrome Evidence*

26. The Indiana Supreme Court has defined Child Abuse Syndrome Evidence as evidence of "typical" behavior profiles or patterns of victims of child sexual abuse. *Stewar[d] v. State*, 652 N.E.2d 490, 493 (Ind. 1995).

27. Such evidence is only admissible when offered by the State if the defense discusses or presents evidence of unexpected behavior patterns seemingly inconsistent with a claim of abuse. *Id.* at 499. Such evidence must also relate to the specific unexpected behavior raised by the defense. *Id.*

28. Teresa Faulkner testified that a typical victim of child abuse might "internalize it" and "show a lot of symptoms of anxiety, depression, regressive type behaviors" or, on the other side of the spectrum, "you will see acting out behavior, sexualized behavior, those types of things."

29. She further testified child molesting victims are often times in need of attention, from a broken family, eager to please, loyal, and needy. She further testified that there is a pattern of how molestation begins and ends.

30. Again, [t]rial [c]ounsel testified that she knew what testimony the trial court judge would let in and not let in and that is why she did not object to the testimony by Teresa Faulkner. This was a trial strategy . . . and does not rise to the level of

ineffective assistance of counsel. Furthermore, there was no evidence presented that showed[,] if the testimony was not allowed in, the verdict would have been different.

31. Further, [t]rial [c]ounsel testified she wanted Ms. Faulkner off the stand and did not want to prolong her testimony. She felt the longer Ms. Faulker was on the stand, the more damage she was causing to [Pierce].

32. The Court concludes that [t]rial [c]ounsel strategically chose not to object . . . .

*Id.* at 150-51, 156-58.

[7] Finally, regarding Pierce's claim that he received ineffective assistance of counsel when she had failed to withdraw following a purported conflict of interest, the post-conviction court found and concluded as follows:

37. Trial [c]ounsel testified she received a threat either right before or right after the guilty verdict.

38. Trial [c]ounsel testified that [Pierce] had told counsel's assistant that[,] if he was found guilty, he and his brother would kill the Judge and both Prosecutors, and that his brother had just purchased a gun.

39. Trial [c]ounsel testified that she immediately asked for an in-chambers meeting and said threats had been made.

40. Trial [c]ounsel testified she waited with law enforcement for several hours before leaving because she was scared and didn't feel safe.

41. Trial [c]ounsel testified there were people driving through the parking lot and there was a lot of commotion after the trial, and her car suffered minor damage.

42. Counsel filed a Motion to Withdraw on October 28, 2008[,] before sentencing.

* * *

43. The Court concludes that no actual conflict of interest existed during Pierce's trial.

44. There was no evidence presented by [Pierce] that he was prejudiced in any way by [t]rial [c]ounsel's representation or what she did not object to or fail to enter into evidence.

*Id.* at 152-53, 161. The court then denied Pierce's petition for post-conviction relief, and this appeal ensued.

# Discussion and Decision

## *Standard of Review*

[8] Pierce appeals the post-conviction court's denial of his petition for post-conviction relief. As our Supreme Court has made clear, post-conviction proceedings are not a "super-appeal." *Garrett v. State*, 992 N.E.2d 710, 718 (Ind. 2013) (quotation marks omitted). Rather, they provide "a narrow remedy to raise issues that were not known at the time of the original trial or were unavailable on direct appeal." *Id.* As the petitioner in such proceedings bears the burden of establishing relief in the post-conviction court, when he appeals

from the denial of his petition he "stands in the position of one appealing from a negative judgment." *Id.* To obtain our reversal of a negative judgment, the appealing party "must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court." *Id.* We will not defer to the post-conviction court's legal conclusions, but we will reverse its findings and judgment "only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Bobadilla v. State*, 117 N.E.3d 1272, 1279 (Ind. 2019) (quotation marks omitted). We may affirm a post-conviction court's judgment "on any theory supported by the evidence." *Dowdell v. State*, 720 N.E.2d 1146, 1152 (Ind. 1999).

### Issue One: Adequacy of the Post-Conviction Court's Findings and Conclusions

[9] Pierce first asserts that the post-conviction court's findings and conclusions are so inadequate that meaningful appellate review is not possible.[1] Indiana Post-Conviction Rule 1 § 6 requires a post-conviction court to enter findings of fact and conclusions of law in granting or denying a petition for relief. Where such

---

[1] We reject the State's argument on appeal that Pierce waived this issue for our review because he "failed to file a motion to correct error[]" in the post-conviction court. Appellee's Br. at 25. Indiana Trial Rule 59(A) states that a motion to correct error is mandatory and a prerequisite for appeal only in two circumstances: to address "[n]ewly discovered evidence" that "could not have been discovered and produced at trial" or to address "[a] claim that a jury verdict is excessive or inadequate." Trial Rule 59(A) adds that "[a]ll other issues and grounds for appeal appropriately preserved during trial may be initially addressed in the appellate brief." As the adequacy of a post-conviction court's findings cannot be complained about prior to its entry, and as such a judgment is neither newly discovered evidence nor an excessive or inadequate jury verdict, the party appealing the judgment may raise its adequacy for the first time on appeal.

findings and conclusions "do not adequately address" the issues raised in the petition such that "we cannot conduct an adequate review" of those issues, we will remand with instructions for the post-conviction court to enter proper findings of fact and conclusions of law. *N.R.G. v. Ind. Dep't of Child Servs. (In re N.G.)*, 61 N.E.3d 1263, 1265-66 (Ind. Ct. App. 2016). We review the facial adequacy of a post-conviction court's judgment *de novo*. *See, e.g.*, *Deen-Bacchus v. Bacchus*, 71 N.E.3d 882, 885 (Ind. Ct. App. 2017).

[10] We acknowledge that several of the post-conviction court's purported findings of fact appear to be mere recitations of witness testimony, which, standing alone, are technically incorrectly labeled as "findings" of fact. *E.g.*, *Pitcavage v. Pitcavage*, 11 N.E.3d 547, 553 (Ind. Ct. App. 2014). However, it is clear from the whole of the court's judgment that it adopted the testimony that it had recited, and in such circumstances the adopted testimony is properly considered on appeal to be a finding of fact. *Id.* Moreover, and in any event, we will not remand for the entry of technically correct findings when the post-conviction court's judgment as a whole, while perhaps containing some "faulty language," makes its "theory" of the judgment clear to the parties, enabling them to "formulate intelligent and specific arguments" for our review. *Id.* at 558. The post-conviction court's judgment as a whole here is adequate; any technically incorrect language aside, the court's theory of decision is clear, the parties plainly understood it, and they have cogently and specifically argued the merits of their respective positions to this Court accordingly. There is no reversible error on this issue.

### Issue Two: Ineffective Assistance of Counsel Claims

[11] Pierce next asserts that the post-conviction court erred when it found that he was not denied the effective assistance of trial counsel. The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to counsel and mandates that "the right to counsel is the right to effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). As our Supreme Court has explained:

> When evaluating a defendant's ineffective-assistance-of-counsel claim, we apply the well-established, two-part *Strickland* test. The defendant must prove: (1) counsel rendered deficient performance, meaning counsel's representation fell below an objective standard of reasonableness as gauged by prevailing professional norms; and (2) counsel's deficient performance prejudiced the defendant, *i.e.*, but for counsel's errors the result of the proceeding would have been different.

*Bobadilla*, 117 N.E.2d at 1280 (citations omitted).

[12] Pierce asserts that he received ineffective assistance of trial counsel for the following reasons: (A) his trial counsel permitted alleged drumbeat evidence to be heard by the jury; (B) she did not object to evidence that J.W. suffered from child abuse syndrome; (C) she did not investigate J.W.'s medical and counseling records prior to trial; (D) she did not move to withdraw upon the appearance of a purported conflict of interest; and (E) she did not call witnesses that Pierce believes would have provided him with favorable testimony. We address each of Pierce's arguments in turn.

## A. Alleged Drumbeat Evidence

[13] We first consider Pierce's argument that the post-conviction court clearly erred when it denied his claim that he had received ineffective assistance of trial counsel when his counsel permitted the jury to hear alleged drumbeat evidence. "There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Weisheit v. State*, 109 N.E.3d 978, 983 (Ind. 2018). "Counsel is afforded considerable discretion in choosing strategy and tactics and these decisions are entitled to deferential review." *Id.* Further, "poor strategy" and "instances of bad judgment do not necessarily render representation ineffective." *Id.* at 984.

[14] The post-conviction court found that Pierce's trial counsel permitted the jury to hear, prior to J.W.'s testimony, testimony from three witnesses who each detailed J.W.'s accounts of Pierce's molestations to them. However, the post-conviction court concluded that Pierce could not establish ineffective assistance of counsel on this claim because his trial counsel had permitted the jury to hear those additional witness accounts as a matter of trial strategy. In particular, the post-conviction court found that Pierce's trial counsel had reasonably concluded that, in her opinion, the trial judge would not have sustained any objection to drumbeat evidence and, as such, she did not bother to object.

[15] We agree with the post-conviction court's conclusion that Pierce's trial counsel permitted this evidence to be heard by the jury pursuant to her trial strategy,

although we agree with that conclusion for reasons supported by the record other than those found by the post-conviction court. *See Dowdell*, 720 N.E.2d at 1152. In particular, the trial transcript makes the defense strategy abundantly clear: trial counsel sought to paint J.W. as a liar, and she wanted the jury to hear as many different versions of J.W.'s "stories" as possible. Trial Tr. Vol. 2 at 104-05.[2]

[16] Indeed, four sentences into her opening statement to the jury, Pierce's trial counsel first identified J.W. as a liar, saying that J.W. had told a "tale of being raped" by Pierce. *Id.* at 104. Pierce's trial counsel continued her opening statement as follows:

> For three short weeks, the tale expanded. All sorts of new . . . details emerged. To cover up the lies[] she told the first time, she said I lied about what I said the first time. From there, [J.W.] just kept lying. Desperate people do desperate things. [J.W.] has told seven versions. Do they match? No they don't. *You ladies and gentlemen are going to get to hear all of them.*

*Id.* at 105 (emphasis added). Pierce's trial counsel then explicitly went over the expected witness testimony and detailed how, according to her, J.W.'s story changed each time. She concluded: "Pay attention to how the versions keep getting bigger and bigger. . . . [I]t is our intention to show you that the allegations being made are false." *Id.* at 108.

---

[2] Our pagination of the original trial transcript is based on the .pdf pagination.

Trial counsel's decision to permit the various witnesses to then inform the jury of the details of J.W.'s recounting of Pierce's molestations to each of them was counsel's explicit strategy. Trial counsel *wanted* the jury to hear all of the different versions of the molestations that J.W. had reported because counsel wanted to use the variances among those versions to undermine J.W.'s credibility. The fact that that strategy did not work out for Pierce does not demonstrate that Pierce received ineffective assistance of counsel.

It is of no moment for Pierce to assert that, if objected to, the recountings of his molestations of J.W. by other witnesses would have been deemed inadmissible. Trial counsel in that scenario would have been left with trying to attack J.W.'s credibility in isolation. That counsel here determined the marginal gain of possible lines of attack on J.W.'s credibility from the additional evidence to outweigh the marginal detriment of having the jury hear of the molestations by more than one witness was a call to be made by counsel in her professional discretion. We affirm the post-conviction court's judgment on this issue.

## B.  Child Abuse Syndrome

Pierce next asserts that the post-conviction court clearly erred when it denied his claim that he had received ineffective assistance of trial counsel when his counsel failed to object to Faulkner's testimony regarding child abuse syndrome. In order to prevail on a claim of ineffective assistance due to trial counsel's failure to object, the post-conviction petitioner "must show a reasonable probability that the objection would have been sustained if made."

*Garrett v. State*, 992 N.E.2d 710, 723 (Ind. 2013). However, "once a child's credibility is called into question, proper expert testimony" regarding child abuse syndrome "may be appropriate." *Steward v. State*, 652 N.E.2d 490, 499 (Ind. 1995).

[20] Here, as trial counsel's opening statement made clear, J.W.'s credibility was immediately called into question, and Pierce's counsel pursued that strategy throughout the State's case-in-chief and her cross-examination of J.W. After Pierce's trial counsel had cross-examined J.W., the State called Faulkner as a witness. Faulkner testified, among other things, that victims of child sexual abuse "[a]lmost always" do not report everything at first but, instead, report the molestations "in segments." Trial Tr. Vol. 3 at 42.

[21] In other words, Pierce's trial counsel opened the door by questioning J.W.'s credibility. This enabled the State to rebut Pierce's argument by calling Faulkner to explain why J.W.'s accounts of the molestations may have been inconsistent. Thus, had Pierce's trial counsel objected to Faulkner's testimony on the ground that it was inadmissible evidence of child abuse syndrome, the trial court would not have been required to sustain the objection. We therefore affirm the post-conviction court's judgment on this issue.

### C. J.W.'s Medical and Counseling Records

[22] Pierce next asserts that the post-conviction court clearly erred when it denied his claim that he had received ineffective assistance of trial counsel when his

counsel failed to obtain J.W.'s medical and counseling records prior to trial. As our Supreme Court has noted:

> With the benefit of hindsight, a defendant can always point to some rock left unturned to argue counsel should have investigated further. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that it deprived the defendant of a fair trial. . . . [W]e review a particular decision not to investigate by looking at whether counsel's action was reasonable in light of all the circumstances. In other words, counsel has a duty to make a reasonable investigation or to make a reasonable decision that the particular investigation is unnecessary. A strategic choice not to present . . . evidence made after thorough investigation of law and relevant facts is virtually unchallengeable, but a strategic choice made after less than complete investigation is challengeable to the extent that reasonable professional judgment did not support the limitations on the investigation. . . .

*Ritchie v. State*, 875 N.E.2d 706, 719-20 (Ind. 2007) (citations omitted). Moreover, "establishing this ground for ineffective assistance . . . require[s] going beyond the trial record to show what the investigation, if undertaken, would have produced" in order to satisfy the prejudice prong of an ineffective-assistance claim. *Woods v. State*, 701 N.E.2d 1208, 1214 (Ind. 1998).

[23] Assuming for the sake of argument that Pierce's trial counsel unreasonably failed to investigate, obtain, and have admitted J.W.'s medical and counseling records, we agree with the post-conviction court's conclusion that there was "nothing of consequence . . . from the records" that would have "change[d] the outcome of the trial." Appellant's App. Vol. 2 at 159-60. Pierce asserts that the

medical records "could have been used to establish additional inconsistencies" in J.W.'s allegations and that the counseling records could have been used to show that J.W.'s mother doubted J.W.'s truthfulness.[3] Appellant's Br. at 28. But the substance of the medical records was presented to the jury by way of the examining nurse's testimony; the medical records themselves would have been merely cumulative of that testimony. And in her cross-examination of J.W.'s mother, Pierce's trial counsel confronted the mother—and attempted to impeach her with prior deposition testimony—with whether the mother doubted J.W.'s recounting of the molestations. J.W.'s counseling record to the same effect would not have changed the outcome of Pierce's trial. We affirm the post-conviction court's judgment on this issue.

## D. Purported Conflict of Interest

[24] Pierce next asserts that the post-conviction court clearly erred when it denied his claim that he had received ineffective assistance of trial counsel when his counsel failed to withdraw after a purported conflict of interest arose. But the post-conviction court found that no conflict of interest existed during Pierce's trial, and that finding is supported by the record. In particular, trial counsel testified that the purported conflict of interest—threats made against her— occurred only "at the end of the trial. It wasn't during the trial." P-C. Tr. at 19.

---

[3] Pierce also asserts that J.W.'s counseling records showed that she doubted another child's sexual-assault claim against J.W.'s father, but we agree with the State that this additional information is not clearly relevant to J.W.'s allegations against Pierce, to say nothing of meeting the high burden of establishing *Strickland* prejudice.

And Pierce does not demonstrate that the delay between the verdict and trial counsel's motion to withdraw had any ultimate relevance. Accordingly, Pierce cannot show that the post-conviction court's judgment on this issue is clearly erroneous, and we affirm.

### E. Purported Failure to Call Witnesses

Finally, Pierce asserts that the post-conviction court clearly erred when it denied his claim that he had received ineffective assistance of trial counsel when his counsel failed to call three witnesses that Pierce asserts would have provided him with favorable testimony. But trial counsel testified that she did not call two of the proposed witnesses because they "did not have anything that was helpful to [Pierce] at all" and she did not call a third because that witness had "indicated that [she] would perjure [herself] intentionally to help [Pierce]." *Id.* at 9. Pierce's argument on appeal does not demonstrate that trial counsel's explanation was substantially incorrect with respect to any of those witnesses. As such, Pierce cannot show that the post-conviction court clearly erred when it rejected Pierce's claim of ineffective counsel on this issue.

## Conclusion

In sum, we affirm the post-conviction court's denial of Pierce's petition for post-conviction relief.

Affirmed.

May, J., concurs.

Bailey, J., dissents with separate opinion.

| | |
|---|---|
| Donald A. Pierce, | Court of Appeals Case No. |
| *Appellant-Petitioner,* | 18A-PC-2848 |
| v. | |
| State of Indiana, | |
| *Appellee-Respondent.* | |

**Bailey, Judge, dissenting.**

[28] Pierce contends he was denied effective assistance of trial counsel and identifies several alleged deficiencies. I agree with the majority's discussion as to conflict of interest and counsel's failures to subpoena medical and psychological records and to present certain witnesses. Nonetheless, I am convinced that trial counsel rendered ineffective assistance in that she simply took a fatalistic approach to the trial and wholly failed to challenge any testimony by any State witness, including drumbeat repetition of J.W.'s allegations and child abuse syndrome testimony.

[29] Counsel purportedly believed that the jury would ultimately hear about J.W.'s evolving reports[4] and chose to pursue a strategy of showing J.W. to be a liar. Assuming this to be a reasonable strategy under the circumstances, the strategy would not have been undermined had counsel insisted that J.W.'s testimony not be *preceded* by a parade of witnesses providing much detail and explaining any inconsistency. And, while counsel was appropriately aware of the trial court's past rulings and was respectful toward the trial court – she was there to advocate for her *client* and not necessarily appease the trial court.[5] Often, a trial strategy is not successful; but this does not mean that counsel should not even *try.* In my view, counsel sat idly by and permitted the State to conduct its case in the sequence and manner that could most efficiently and expediently bring about a conviction.[6] She did so without lodging a single objection that would

---

[4] I term the reports of molestation to be "evolving" as opposed to "changing" because J.W.'s later statements provided additional detail but she did not at any time recant the initial accusations.

[5] Counsel explained her lack of any objection to testimony from Grandfather, Father, Mother, Deputy Young, or Faulkner, as follows:

> I had sat in on a child molest trial that was in the same court in front of Judge Lopp, at the time, before [Pierce]'s and so I kind of knew what he let in and what he didn't let in and so as a defense attorney you always have to sit and think how much is it going to damage the client if you jump up and down and make a big deal during someone's testimony like this because the thing is I don't have any reason to think that [Faulkner] was lying or making up anything. I mean she happened to believe J.W. and we didn't. So again, that was just strategy of why am I going to jump up and down and object to something that, I mean all these things that she testified to, I mean not in reference to [Pierce], but just in reference of, to child molesters, is accurate.

(P-C.R. Tr., pg. 15.)

[6] She even acknowledged the "time-saving" benefit of a lack of objection:

> Well, you know, it's hearsay, but she was on the witness list for them and she would, I would have called her had they not, so in my mind this was going to come in one way or the other, I mean it was saving time[.].

(P-C.R. Tr., pg. 17.)

focus the trial court's attention upon Pierce's right, under the law, to promote preservation of the presumption of his innocence. And counsel apparently did not understand, as evidenced by her testimony at the post-conviction hearing, that she should – or even could – object.[7]

[30] To prevail on a claim of ineffective assistance due to the failure to object, a petitioner must show that an objection would have been sustained if made. *Overstreet v. State*, 877 N.E.2d 144, 155 (Ind. 2007). By the time of Pierce's trial, it was well-settled that a victim's veracity should not be "vouchsafed," that is, bolstered, by a parade of witnesses repeating accusations. *Modesitt v. State*, 578 N.E. 2d 649, 651 (Ind. 1991). "Drumbeat repetition of the declarant's statements prior to the declarant's testifying and being subject to cross examination" was specifically disapproved of by our Indiana Supreme Court in *Modesitt*.

[31] There, the defendant was on trial for child molestation and the prosecutor called three witnesses to recount what the victim had told them prior to calling the victim to testify; even then, the victim corroborated less than all the alleged

---

[7] Counsel did not recognize that drumbeat testimony in the child victim context prompts heightened concern compared with repetitive testimony in the "asked and answered" context. When asked about considering an objection to drumbeat repetition of allegations, counsel summarized her perception:

> Even in civil cases, like divorce cases, you object and you say your honor this is asked and answered and they say well, it doesn't matter and they let it in again, so I mean I've never been successful, on a repetitive or asked and answered unless you've just got a situation where the attorney is absolutely bullying your client and then that, you know, might be a different scenario, but we didn't have that.

(P-C.R. Tr. pg. 26.)

acts already testified about and was not asked if she had made the prior statements or whether the statements were, in fact, true. *Id.* at 650. The Court observed that, "by putting into evidence the victim's out-of-court charges against Modesitt by three separate and repetitive witnesses *prior to* calling the victim herself, the prosecutor effectively precluded Modesitt from effective cross examination of these charges." *Id.* at 651 (emphasis in original).

[32] The Court was unable to "say that the drumbeat repetition of the victim's original story prior to calling the victim to testify did not unduly prejudice the jury which convicted Modesitt." *Id.* at 652. This was so because direct, immediate cross-examination of the statements was precluded, and "the victim's veracity had been, in essence, vouchsafed by permitting the three witnesses to repeat the accusations of the victim." *Id.* at 651.

[33] The Court held "from this point forward, a prior statement is admissible as substantive evidence only if the declarant testifies at trial and is subject to cross examination concerning the statement, and the statement is (a) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (b) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive, or (c) one of identification of a person made after perceiving the person." *Id.* at 653-54.

[34] And prior to *Modesitt*, this Court recognized the prejudice inherent in the admission of cumulative out-of-court statements where the credibility of the child witness is "of critical importance to the State's case." *Stone v. State*, 536 N.E.2d 534, 541 (Ind. Ct. App. 1989).

> Whether the jury could believe [Child]'s account of the molestation depended upon his credibility in its eyes. Without doubt the line between [Child]'s credibility became increasingly unimpeachable as each adult added his or her personal eloquence, maturity, emotion, and professionalism to [Child]'s out-of-court statements. Such rampant repetition probably built [Child]'s credibility to such a height Stone's presumption of innocence was overcome long before he got to the stand to deny the charges against him.

*Id.* at 540.

[35] I acknowledge that counsel called J.W. a liar in her opening statement and that comments by counsel can sometimes open a door. That said, I do not believe that the bald assertion by defense counsel opened the floodgates. And the State unleashed a flood of hearsay testimony, met with no objection and no request for a limiting instruction. Specifically, J.W.'s grandfather ("Grandfather") testified that J.W. had related "problems she was having" with Pierce. (Tr. Vol. II, pg. 119.) Grandfather provided some details of the "problem":

> Well at first she told me she had woken up and he was fooling around with her, messing, I don't remember what she said. Fooling around with her or messing around with her.

*Id.* Grandfather testified that J.W. had said to him "we [Pierce and J.W.] done it, papaw," this had occurred "lots of times," and it was sometimes "fun." *Id.* at 130-31. J.W.'s father ("Father") testified that he learned from J.W.'s maternal grandmother "what [J.W.] was saying" and Father began to "holler and cuss." *Id.* at 144. Father contacted the Crawford County Sheriff's Department and was connected to Deputy Debra Young ("Deputy Young"). Father also contacted Mother, who "kicked out" Pierce from her home. *Id.* at 149. Father explained he had tried to be understanding toward Mother, as "the man she loved had just hurt her child." *Id.* at 151. As for details of the accusations, Father stated "all I knew was that he had touched her." *Id.* at 150.

[36] In turn, Deputy Young testified that Father had contacted her after he "learned that [J.W.] had sexual contact with her mother's boyfriend." *Id.* at 167. Deputy Young explained that she had contacted the Department of Child Services and Mother; she had then arranged a collaborative interview because successive interviews tended to "re-victimize" the "victim." *Id.* at 169. According to Deputy Young, Mother had evicted Pierce and Mother had "relayed" to her that "[J.W.] had told her there had been incidents with [Pierce] that he had been in her bedroom and she had awakened with him on top of her." *Id.* at 170. Deputy Young continued: "[J.W.] did say that Andy Pierce had come into her room while she was asleep and that she would be awakened by him on top of her moving up and down." *Id.* at 172.

[37] Encouraged to provide additional details of J.W.'s allegations, Deputy Young explained that Pierce's "private part" had been "hard" and "he had sexual

intercourse with her approximately four times," beginning around Valentine's Day of 2007. *Id.* at 173-74. She related J.W.'s description as: "he had put his penis, I believe, in her monkey and afterwards she felt wet, that he'd be on top of her moving up and down." *Id.* at 174.

[38] Deputy Young testified that she was contacted again by someone in J.W.'s family and told that J.W. needed to be re-interviewed. By this time, J.W. was reportedly saying that she had not told the entire truth before, that is, she had not been asleep and the events had started around Easter of 2006. Deputy Young related the substance of the second interview:

> [Pierce] asked if she wanted to play a game. [Pierce] asked her if she trusted him. If she loved him and loved her mom and she said yes and she said that he took his clothes off, then he took her clothes off and then he said, they started wrestling around and I guess there was a couch that was opened into a bed that they were wrestling on and she said he then started fondling her, touching her private parts with his hands. She said she asked him what he was doing and he didn't answer. Uh, she said that it went on a little bit, then he got up and went in another room and then he came back and then when he came back, that he started putting his private part on her private part and then she said that she felt like he had put his private part in her private part and that he moved up and down on top of her.

*Id.* at 177. The frequency had been reported as "pretty much every time that they were alone and that would normally be on the every other weekend that she wasn't at her father's." *Id.* According to Deputy Young, J.W. had made an additional allegation, that is, "Pierce had gave her face" by "put[ting] his tongue and his mouth on her private parts." *Id.* at 178. As for why these

details had not come out in the first interview, Deputy Young said, "I believe it was basically she didn't want to hurt her mom" and "she was scared." *Id.*

[39] Mother then testified. She reiterated that she had told Pierce to "get the hell out" for touching J.W. inappropriately. *Id.* at 201. Mother testified that she had learned of the molestation "at the time my mom and dad came up to work and called me outside and told me [J.W.] had told her grandfather that [Pierce] had touched her and they came and I called her and asked her about it and she said at the time she was telling me that he had come into her room at night a few times." *Id.* at 200. Mother provided details largely consistent with Deputy Young's earlier description:

> [J.W.] told me the first time the details of her story were not true. She told me that it was, he didn't come into her room at night. He, while I was at work, he asked her to come into the bedroom one day and then asked her if she trusted him of course, she said yes. She wouldn't have any reason not to. Then [they] proceeded to take their clothes off and he made it into a game that they played and she – the weekends she was home from her dads and I was at work. They would play this game and it happened for a long time for about a year or more and so I had to call the Comfort House and tell them and so she could [go] back in and talk to them again.

*Id.* at 208. Mother asserted that J.W. "doesn't make stuff up like that." *Id.* at 210. During cross-examination, Mother conceded that J.W. had "technically lied" in the initial recorded statement but clarified "she is not a liar." *Id.* at 217. On re-direct, Mother made it clear that she "had always believed J.W., from the moment she told." *Id.* at 225.

After this group of witnesses, J.W. testified and confirmed many of the foregoing details. That is, she testified that Pierce initiated "a game" during which they took their clothes off. *Id.* at 245. The activity ultimately involved Pierce putting "his private on her private" and moving up and down and "using his mouth on her private" and "moving his tongue." *Id.* at 247-49. She had fabricated the story of being asleep "because of Mother's feelings." *Id.* at 251.

The State called Teresa Faulkner, MSW ("Faulkner") to testify, and explored her educational background, employment, and clientele. Faulkner clarified that the majority of her clients were "needing to deal with abuse issues." (Tr. Vol. III, pg. 44.) Absent an objection, the record is void of any discussion or context within which to evaluate the propriety of Faulkner being called as an expert or skilled witness to provide child abuse syndrome evidence.

The Indiana Supreme Court has found "child abuse syndrome evidence" to be inclusive of evidence of "typical" behavior profiles or patterns exhibited by victims of child sexual abuse. *Steward v. State*, 652 N.E.2d 490, 493 (Ind. 1995). Because generally accepted research recognizes that child victims may exhibit unexpected behavior patterns seemingly inconsistent with a claim of abuse,

> if the defense discusses or presents evidence of such unexpected behavior by the child, or if during trial testimony the child recants a prior allegation of abuse, a trial court may consider permitting expert testimony, if based upon reliable scientific principles, regarding the prevalence of the specific unexpected behavior within the general class of reported child abuse victims. To be admissible, such scientific evidence must assist the finder of fact in understanding a child's responses to abuse and satisfy

the requirements of both Rule 702(b) and the Rule 403 balancing test.

*Id.* at 499.

[43] Here, during the State's case-in-chief, Faulkner testified without objection regarding behaviors typical of abused children, traits of susceptible children, the desensitization process, and secrecy agreements. Most relevant here, because J.W. had successive interviews with developing detail and had described the sexual contact with Pierce as "consensual," is Faulkner's explanation of why "they don't tell you everything at first." (Tr. Vol. III, pg. 48.)

> What the children generally tell me after is that they're afraid of the consequences. They're not sure what's going to happen, so it comes out in segments. And also it's a way to not place the responsibility on themselves because through the entire grooming process, they're conditioned to feel like it is their fault. …

> They sometimes will block it. They will sometimes minimize what has happened. You know, it's not uncommon to have some variations in a story. While the abuse is occurring and even thereafter, they're spending their time trying to block this from their mind. So, when it becomes, when its disclosed, they're being asked to recall all this information that they might have spent years trying to block. …

> I can't give you a number, but I would say most every child, one of their biggest concerns is, you know, what, what are my parents going to think and what is going to happen. … That is the norm that they consent. … Well there can be a magnitude of reasons. One of the biggest ones is because it's with a perpetrator who has a relationship and a report [sic] with this child and this child has

developed a trust. They trust this adult and children are taught anyway to be very compliant with adults and authority figures, so they feel completely powerless to try to stand up to someone that's represented as an authority to them.

*Id.* at 48-50.

[44] Counsel called a sole defense witness, Deputy Young, who was arguably a rather unhelpful *defense* witness, as she provided some additional hearsay details after being recalled to the stand. In particular, she testified that Father reported to her that J.W. had confirmed "penetration and ejaculation," (Tr. Vol. III, pg. 99); J.W. had described Pierce's penis as "stiff," *id.* at 104; and J.W. had described the degree of penetration as being "fifty-fifty," *id.* at 105.

[45] I must agree with Pierce that his trial counsel's performance fell below professional norms when she stood idly by while the jury was inundated with drumbeat repetition of J.W.'s allegations, even before J.W. testified, and while quasi-expert testimony provided explanations for any perceived inconsistencies. Moreover, in a case lacking physical evidence, an eyewitness, or other corroboration, the crucial determination to be made by the jury was its assessment of J.W.'s credibility.

[46] "Prejudice" in the context of post-conviction proceedings has been specifically defined. It exists when a claimant demonstrates that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*,

466 U.S. 668, 694 (1984). Here, the onslaught of "vouchsafing" testimony prior to J.W.'s testimony eroded Pierce's presumption of innocence. Then the potential harm to Pierce was exacerbated when inconsistencies in J.W.'s out-of-court statements were addressed in the context of child abuse syndrome evidence. These events sufficiently undermine confidence in the verdict rendered. In such a case, we should "view the evidence without inadmissible hearsay statements" to assess whether there is a reasonable probability the result of trial would have been different. *Id.* at 689. Excluding hearsay, we are left with J.W.'s testimony and a nurse's testimony that she could not document injury. We cannot know to a certainty, or precise mathematical probability, what the jury would have done. But as for the burden imposed upon Pierce, I am persuaded that he has met his burden by a preponderance and he is entitled to post-conviction relief.

[47] Therefore, I dissent.